IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Petition for Relief from Personal | ) | No. 28165-5-III |
| Restraint of: | ) | |
| | ) | |
| | ) | PUBLISHED OPINION |
| | ) | |
| WALTER WILLIAM COPLAND. | ) | |

KULIK, J. — After a long day of drinking with friends, Walter William Copland fatally shot one of his friends in the head. A Benton County jury convicted him of first degree manslaughter, with a firearm sentencing enhancement. In this timely petition, he seeks relief from personal restraint, contending (1) his constitutional right to a public trial was violated when some potential jurors were interviewed privately in chambers, and (2) new evidence supports vacation of his judgment and sentence and the setting of a new trial. We conclude that Mr. Copland's contentions are without merit. Accordingly, we dismiss the petition.

FACTS

On September 15, 2005, Mr. Copland and his friend John Stevens drank together most of the day. They eventually ended up on Mr. Stevens's back patio, where they were

joined by a mutual friend, Al Anthis. At around 8:00 that night, Mr. Copland said to Mr. Anthis, "You know, I could shoot you or kill you." Report of Proceedings (RP) at 689. Mr. Anthis replied, "Well, bring it on." RP at 689. Mr. Copland then walked up to Mr. Anthis, put a gun to his temple, and shot him. Mr. Stevens witnessed the shooting and called 911. Afterward, Mr. Copland made several statements admitting that he fired the fatal shot.[1]

The State charged Mr. Copland with first degree murder and first degree manslaughter, both crimes committed while armed with a deadly weapon, "to-wit: .22 caliber handgun." Response Br., App. A. At trial, the defense was that Mr. Copland lacked the mental capacity to commit either crime due to intoxication. The jury found him guilty of first degree manslaughter and found by special verdict that he was armed with a firearm. He was sentenced to 150 months, including a 60-month firearm enhancement. This court affirmed his judgment and sentence on appeal. *State v. Copland*, noted at 140 Wn. App. 1006, *review denied*, 163 Wn.2d 1036 (2008), 2007 WL 2254420. The mandate was filed on June 23, 2008.

On June 15, 2009, Mr. Copland filed this timely petition for relief from personal restraint. After the response brief and the reply brief had been filed, the petition was

---

[1] The facts are set out in *State v. Copland*, noted at 140 Wn. App. 1006, *review*

2

stayed pending the mandate in *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). In supplemental briefing filed during the stay, Mr. Copland challenged the firearm enhancement. The stay was lifted on January 11, 2013, and the parties were asked to address the applicability of *Wise*, *State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012), and *In re Personal Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012).

Relief by way of a collateral challenge to a judgment and sentence is extraordinary. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). A personal restraint petition filed within one year after the judgment and sentence is final generally may challenge the conviction on any grounds, but must meet a high standard. *Id.* The petitioner must show with a preponderance of the evidence that he or she was actually and substantially prejudiced by a violation of constitutional rights, or that his or her trial suffered from a nonconstitutional defect that inherently resulted in a complete miscarriage of justice. *Id.*; *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 874, 16 P.3d 601 (2001). Additionally, the petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)). Washington courts have limited the relief

---

*denied*, 163 Wn.2d 1036 (2008), 2007 WL 2254420.

3

considered in the "interests of justice" to cases where an intervening change in the law or some other circumstance justified the failure to raise a crucial argument on appeal. *Id.* (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)). A petitioner who renews an issue may not merely present different factual allegations or raise different legal arguments. *Id.* (quoting *Davis*, 152 Wn.2d at 671).

## ANALYSIS

*Right to a Public Trial.* Mr. Copland contends his constitutional right to a public trial was violated when some of the potential jurors were interviewed privately in the judge's chambers. The State contends Mr. Copland waived his right to raise the public trial issue because he did not raise it on appeal. But a petitioner may raise issues in a collateral challenge that were not raised on appeal, including arguments that the criminal proceeding violated constitutional law. *See* RAP 16.4(c)(2).

The state and federal constitutions guarantee criminal defendants a right to a public trial. *See* CONST. art. I, § 22 (the "accused shall have the right . . . to have a speedy public trial"); U.S. CONST. amend. VI ("the accused shall enjoy the right to a speedy and public trial"); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Additionally, article I, section 10 of the Washington Constitution guarantees the public's open access to judicial proceedings ("[j]ustice in all cases shall be administered openly").

4

The public trial right is so important that its violation is considered a structural error, meaning it affects the framework within which the trial proceeds. *Wise*, 176 Wn.2d at 5-6. A violation of the public trial right is presumed prejudicial on direct appeal, even when the violation is not preserved by objection. *Id.* at 16.

Although vital, the right to a public trial is not absolute. *Id.* at 9; *Paumier*, 176 Wn.2d at 34-35. A trial court may close a courtroom if it first balances the public trial right against competing rights and interests, using the five criteria established in *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).[2] *Wise*, 176 Wn.2d at 10. As summarized in *Wise*, the *Bone-Club* criteria require the trial court, on the record, to at least (1) state the public trial right that will be lost by moving proceedings into a private

---

[2] The *Bone-Club* factors include:
"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
"4. The court must weigh the competing interests of the proponent of closure and the public.
"5. The order must be no broader in its application or duration than necessary to serve its purpose."
*Bone-Club*, 128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

room, (2) identify the compelling interest that motivates the closure, (3) weigh the competing rights, (4) give an opportunity to object, and (5) adopt the least restrictive alternative of closure. *Id.* Although a trial court may close all or part of a trial after considering the alternatives, it must "'resist a closure motion except under the most unusual circumstances.'" *Id.* at 11 (quoting *Bone-Club*, 128 Wn.2d at 259).

It is well settled that the public trial right extends to jury selection. *Id.* Relevant to this case, the right applies to the questioning of individual prospective jurors. *Id.* (citing *State v. Momah*, 167 Wn.2d 140, 151-52, 217 P.3d 321 (2009); *State v. Strode*, 167 Wn.2d 222, 227, 217 P.3d 310 (2009)). Mr. Copland contends the trial court did not consider the *Bone-Club* factors on the record when it decided to interview certain potential jurors in chambers. As a result, he asserts, the voir dire process was closed in violation of the public trial right and the violation is presumed prejudicial. We first consider whether Mr. Copland meets the standards for relief afforded a petitioner in a personal restraint petition.

*Prejudice Standard on Collateral Review of a Judgment and Sentence.* Mr. Copland contends he is entitled to relief because the trial court violated his constitutional right to an open and public trial. Because he raises this issue in a collateral challenge of his judgment and sentence, he must show with a preponderance of the evidence that he

6

was actually and substantially prejudiced by the constitutional violation. *Coats*, 173 Wn.2d at 132. At this time, the Washington Supreme Court has not resolved whether a public trial violation is presumed prejudicial in a collateral challenge as well as in a direct appeal. *Morris* declined to rule on this question: "We need not address whether a public trial violation is also presumed prejudicial on collateral review because we resolve [Mr.] Morris's claim on ineffective assistance of appellate counsel grounds instead." *Morris*, 176 Wn.2d at 166. Although a petitioner claiming ineffective assistance of counsel must also show prejudice—due to the deficient performance of counsel—*Morris* found prejudice in the fact that if appellate counsel had raised the public trial issue on appeal, the defendant would have received a new trial due to structural error. *Id.*

Previously, *Orange*, another collateral review of the public trial issue, reiterated that the petitioner claiming constitutional error must show that the error "'worked to his actual and substantial prejudice.'" *Orange*, 152 Wn.2d at 804 (quoting *In re Pers. Restraint of Lile*, 100 Wn.2d 224, 225, 668 P.2d 581 (1983)). Like *Morris*, however, *Orange* found prejudice in review of the effectiveness of appellate counsel. *Id.* at 814 ("had [Mr.] Orange's appellate counsel raised the constitutional violation on appeal, the remedy for the presumptively prejudicial error would have been, as in *Bone-Club*, remand for a new trial"). *Orange* quoted *In re Personal Restraint of St. Pierre* for the proposition

7

that the petitioner's burden of establishing prejudice "'may be waived where the error gives rise to a conclusive presumption of prejudice.'" *Id.* at 804 (quoting *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 328, 823 P.2d 492 (1992)). But *Orange* also noted that *St. Pierre* explicitly rejected the suggestion made in prior dicta that constitutional errors that "are per se prejudicial on direct appeal 'will also be presumed prejudicial for the purposes of personal restraint petitions.'" *Id.* (quoting *St. Pierre*, 118 Wn.2d at 328). Indeed, a petitioner raised a similar argument in *In re Personal Restraint of Benn*, 134 Wn.2d 868, 952 P.2d 116 (1998) when he claimed that an erroneous self-defense instruction was presumptively prejudicial. The Supreme Court noted that although the error was presumptively prejudicial when raised on direct appeal, "[t]here is no presumption of prejudice when an instruction is challenged in a personal restraint proceeding." *Id.* at 940.

Recently, *Coats* examined the history of the personal restraint petition and noted that, because the petitioner has had a prior opportunity for judicial review, the petitioner must show that he or she was actually and substantially prejudiced by the constitutional error. *Coats*, 173 Wn.2d at 132. This language seems to indicate that the petitioner must show that he or she was personally and directly disadvantaged by the constitutional violation. And Division Two of this court recently ruled, in part, that a collateral

8

challenge based on an alleged public trial violation was not entitled to a presumption of prejudice. *See In re Pers. Restraint of Stockwell*, 160 Wn. App. 172, 181, 248 P.3d 576 (2011), *review denied*, ___ Wn.2d ___ (2013). Relying on *Momah*, *Stockwell* also held that, under its particular circumstances, the closure of juror questionnaires was not a structural error and affected, at most, the public's right to an open proceeding. *Id.*

Considering the weight of opinion that—in almost all cases—petitioners must show actual and substantial prejudice when they claim constitutional error on collateral review, this court could dismiss Mr. Copland's public trial claim due to his failure to argue anything but presumptive prejudice.[3] But also considering the Supreme Court's specific reservation of a ruling on this issue, as well as the few cases like *St. Pierre* that hold that some errors may be presumed prejudicial in personal restraint petitions, we are not inclined to dismiss on this basis alone.

*Invited Error.* The State also urges this court to dismiss because Mr. Copland invited any public trial error by moving the trial court to close the entire jury selection

---

[3] For the first time in the reply brief, and again in a supplemental brief, Mr. Copland contends he had ineffective assistance of appellate counsel and argues that he was prejudiced because he would have been entitled to a new trial if the public trial violation had been raised on appeal, citing *Orange*, 152 Wn.2d at 814-15 and *Morris*, 176 Wn.2d at 166. Because the issue of ineffective assistance of counsel was raised over one year after Mr. Copland's judgment and sentence was mandated, it is untimely under RCW 10.73.090(1) and it does not qualify for an exception to the one-year rule under

process to the public. A party may not set up an error at trial and then complain of it on appeal. *Momah*, 167 Wn.2d at 153; *State v. Henderson*, 114 Wn.2d 867, 870, 792 P.2d 514 (1990) (quoting *State v. Boyer*, 91 Wn.2d 342, 344-45, 588 P.2d 1151 (1979)). To determine whether the invited error doctrine is applicable to a case, we may consider whether the petitioner "affirmatively assented to the error, materially contributed to it, or benefited from it." *Momah*, 167 Wn.2d at 154.

In *Momah*, defense counsel agreed to private questioning of potential jurors and argued for expansion of the in chambers questioning. *Id.* at 146. Defense counsel also actively participated in the questioning to determine the extent of the potential jurors' prior knowledge of the case and their ability to be fair and impartial. *Id.* The trial court did not, however, discuss the *Bone-Club* factors on the record before the partial closure. *Id.* at 145-47. Although *Momah* found that this was not a "classic case of invited error," it applied the basic premise of the invited error doctrine to determine what relief should be granted for insufficient consideration of the *Bone-Club* factors. *Id.* at 154-55. Because defense counsel "made a deliberate choice to pursue in-chambers voir dire to avoid 'contamination' of the jury pool by jurors with prior knowledge of [Mr.] Momah's case" and actively participated in questioning as a tactical choice, *Momah* held that the

---

RCW 10.73.100.

10

closure was not a structural error and did not actually prejudice Mr. Momah. *Id.* at 155-56.

The facts of Mr. Copland's case present an even stronger argument for invited error than the facts in *Momah*. Unlike in *Momah*, where the trial court took the initiative in proposing that selected potential jurors should be questioned in chambers, defense counsel here asked the trial court to close the courtroom to members of the media during the jury process to prevent contamination of potential jurors. The State objected to full closure as a potential public trial violation, but noted that individual private interviews of jurors who indicated a desire for privacy might be constitutionally viable if a proper record was made to support the decision. The court then denied defense counsel's motion to close the courtroom during voir dire, but eventually agreed to allow the parties to suggest prospective jurors that should be separately questioned. Defense counsel gave the court a list of potential jurors to question in chambers and actively participated in the screening.

Mr. Copland's trial counsel initiated the closure, sought full closure of the courtroom during voir dire, and benefited from the closure because it gave him the opportunity to discover potential biases in the jurors. It appears that he actively pursued and participated in the very error that he complains of in this petition: a claimed violation

11

of his personal right to a public trial under article I, section 22. *Momah*, 167 Wn.2d at 153; *Henderson*, 114 Wn.2d at 870 (quoting *Boyer*, 91 Wn.2d at 344-45).[4] This court may dismiss on the basis of invited error, or may use the same facts to support dismissal under *Momah* for failure to show prejudice.

But a defendant may not be able to waive the public's right under article I, section 10 to open proceedings. *Strode*, 167 Wn.2d at 229 (four-justice plurality). Thus, even if we consider dismissing Mr. Copland's article I, section 22 public trial issue as invited error, we must analyze whether the public's right was violated and what effect that violation had on Mr. Copland's conviction.

*Violation of the Right to a Public Trial.* On March 27, 2006, before beginning voir dire of prospective jurors, Mr. Copland's trial counsel asked the court to close the courtroom to members of the media during the jury process to prevent contamination of potential jurors. In response, the prosecutor noted that *Orange* prohibits closure of the courtroom during the jury selection process and said, "I just don't think we can run the risk of having this case reversed on a decision that would appear to fly in the face of decisions by the state [S]upreme [C]ourt." RP (Mar. 27, 2006) at 271. The prosecutor added, however, that one exception to complete closure is private interviews for jurors

---

[4] An argument could also be made that he knowingly, voluntarily, and intelligently

who have notified the court that they want to talk privately in chambers, after the court has made a proper record to support each private interview. The trial court denied defense counsel's request to close the courtroom to the media, stating,

> [t]his court does not feel that the case law and the court rules would allow such a broad prohibition in regard to not being able to film during the course of the jury selection process.
> I would agree with [the prosecutor]. I think that there are special circumstances where an individual juror may have some issues regarding confidentiality, that those jurors could be perhaps interviewed in chambers, but a blanket prohibition on the media filming the jury selection process I don't think is permissible and I don't think it's appropriate.
> So, I'm going to deny that request.

RP (Mar. 27, 2006) at 272. Members of the media in the courtroom then indicated to the trial court that they would comply with the court's request to film the jurors without showing their faces. The transcript of the March 27, 2006 voir dire proceedings is not in the record, but the trial court indicated that it would begin by asking for a show of hands from those potential jurors who knew the victim or details of the case, or who had other conflicts. This information was expected to help flag the people who would be interviewed privately. There is no evidence in the record or any showing by Mr. Copland that any jurors were actually interviewed in private on this first day of voir dire.

The next day, before beginning voir dire, the prosecutor and defense counsel

---

waived his right to a public trial proceeding. *See Strode*, 167 Wn.2d at 229 n.3.

13

addressed the court:

>    MR. MILLER [the prosecutor]: I think just that there seems to be
> some jurors it makes sense to interview in chambers. I don't know what the
> court's feeling is. We do have t.v. cameras. Mr. Purtzer [defense counsel]
> and I had a previous discussion about people who have criminal history
> involving themselves or family members or indicate a significant alcohol
> problem with either themselves or somebody close to them. We may get
> more candor if it's done in chambers.
>    MR. PURTZER: I agree. I think that's appropriate.
>    MR. MILLER: They didn't necessarily check the last box, which is
> do you have anything you want to discuss privately, but, on the other hand,
> I'm not sure they're aware of the importance of alcoholism to this or
> alcohol abuse or use is in this trial. I think Mr. Purtzer and I both would be
> intending to ask relatively detailed questions about that, and I think also the
> same thing when you're talking about someone's criminal history and
> background either as a victim or as a defendant.
>    THE COURT: Mr. Purtzer?
>    MR. PURTZER: No, I agree. I think we should do that.

RP (Mar. 28, 2006) at 2-3. The trial court then asked the parties to identify the

prospective jurors who should be privately questioned. Based on the responses to the

juror questionnaire, the prosecutor named seven or eight persons that he and defense

counsel had apparently agreed should be questioned apart from the other potential jurors.

Both parties agreed with the trial court that the named jurors would be asked about

alcohol history, criminal history, and the case's publicity. The trial judge and the parties

then recessed to reconvene in chambers and question the identified jurors.

Voir dire continued on March 29, 2006. Defense counsel presented the court with

14

14 additional jurors he felt should be interviewed in chambers. The prosecutor then told the court he wanted to make a record that three television stations were in the court and that he and defense counsel would be interviewing in chambers only those jurors "who may have personal, private issues that they would be more likely to discuss in the privacy of chambers as opposed to open court." RP (Mar. 29, 2006) at 12. Noting that the same television stations were in the court the day before, the prosecutor stated that the media had not objected on either day to the voir dire procedure: "So no media has been barred from these chamber interviews that has objected to the process, and I think that the reasons we're doing these select jurors, which my understanding has been approved by the court, are for legitimate reasons and justify the chambers approach." RP (Mar. 29, 2006) at 12. The court responded that the identified jurors had privacy issues and would probably be more candid disclosing certain issues in chambers, "and for those reasons the court does find those interviews in chambers are justified." RP (Mar. 29, 2006) at 13. The trial court then asked the media representatives present in the courtroom if they had any objection to jury selection proceedings. All of the media representatives indicated that they had no objection.

Our task is to determine whether the procedures adopted during these three days of voir dire proceedings satisfied *Bone-Club*. Under the minimum *Bone-Club* criteria

15

established in *Wise*, we first ask whether the trial court stated that the public trial right would be abridged by moving voir dire for some jurors into chambers. *Wise*, 176 Wn.2d at 11. Although the trial judge did not specifically use the words "right to public trial" or "*Bone-Club*" in court, it is clear from the transcript that defense counsel's request to close the courtroom during juror selection was rejected as a potential public trial violation. Each of the parties understood that interviewing selected jurors in chambers impinged upon the public's right to an open and public trial.

The "compelling interest" mentioned by the parties as motivating the partial closure (*Wise*'s second factor) was threefold: to protect juror privacy in sensitive subject areas, to allow jurors to be more candid in their answers, and to prevent contamination of potential jurors from publicity. The larger interest protected is thus Mr. Copland's right to an impartial jury and a fair trial. *See Momah*, 167 Wn.2d at 152 (voir dire is a significant aspect of trial because it allows parties to secure their article I, section 22 right to a fair and impartial jury through juror questioning).

Under the third *Wise* factor (the fourth *Bone-Club* factor), the court must weigh on the record the competing rights of the proponent of closure and the public. *Wise*, 176 Wn.2d at 10-11. When, as here, the defendant has requested the closure to ensure a fair trial, his or her right to an impartial jury must be harmonized with the public's right to

16

openness. *Momah*, 167 Wn.2d at 152. Here, the trial court refused defense counsel's request to fully close the courtroom during voir dire, agreed with the parties' suggestion that jurors with specific privacy and bias issues could be interviewed privately, and asked the media representatives on the second day if they objected. The trial court in its ruling on the closure stated that the privacy issues of certain jurors justified the interviews in chambers. *Compare Wise*, 176 Wn.2d at 10 n.3 ("[J]uror privacy is an interest that a trial court may consider when determining whether to close part of a trial, though it must be weighed against the defendant's and public's interests in an open trial."). The court's reluctance to close the courtroom and careful consideration of arguments from both parties that partial closure was appropriate, implicitly—if not overtly—complied with the *Wise* and *Bone-Club* requirement to weigh competing interests.

The fourth *Wise* factor (and second *Bone-Club* factor) requires the trial court to give the public an opportunity to object to closure. *Wise*, 176 Wn.2d at 10-11. Mr. Copland contends the court's failure to ask those present in the courtroom on March 28, 2006, whether they had any objection to the partial closure was a violation of the public trial right that requires reversal. (The audience was given an opportunity to object on March 29, 2006.) The record does not reveal whether other spectators were in the audience, and Mr. Copland does not assert any public trial right other than the right of the

17

media.

It is still an open question whether a criminal defendant has standing to assert the public's right to an open trial under article I, section 10. *See Wise*, 176 Wn.2d at 15-16 n.9 (citing *Strode*, 167 Wn.2d at 229 (four-justice plurality opinion stating that the defendant cannot waive the public's right to open proceedings) and at 236 (Fairhurst, J., concurring, and stating that the defendant should not be able to assert the right of the public or the press in order to overturn his or her conviction)). The trial court here did not specifically ask those present in the courtroom on March 28, 2006, whether they had an objection to the private questioning of some jurors in chambers. But when asked the next day if they objected to the jury selection proceedings, the media representatives indicated that they did not. And they did not rebut the prosecutor's statement that they had not objected to the partial closures during voir dire on March 28, 2006. Thus, even if Mr. Copland has standing to assert the public's right to an open trial, he fails to show that the right was violated or that he was prejudiced.

The fifth *Wise* factor (and fifth *Bone-Club* factor) requires the trial court to adopt the least restrictive alternative of closure. In this case, the trial court denied a defense motion for full closure during voir dire and limited the private interviews to those jurors who had indicated they had issues with alcohol use and criminal history or who had prior

18

knowledge of the case. Accordingly, the record shows that the trial court attempted to adopt the least restrictive partial closure of voir dire.

*Conclusion: Application of* Momah. Here, as in *Momah*, defense counsel "assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it." *Momah*, 167 Wn.2d at 151. Also as in *Momah*, the trial court only agreed to in chambers questioning of some jurors after consulting with defense counsel and the prosecutor and only to safeguard Mr. Copland's constitutional right to a fair trial by an impartial jury. *Id.* Although the trial court did not explicitly name each of the *Bone-Club/Wise* factors, the record here is at least as clear as the record in *Momah* in showing that the trial court effectively considered those factors in making its decision. *See Momah*, 167 Wn.2d at 155-56. Both *Wise* and *Paumier* recognize the "unique facts" supporting partial closure in *Momah*. *See, e.g., Wise*, 176 Wn.2d at 15 ("The unique facts of *Momah* are not present in [Mr.] Wise's case. We emphasize that it is unlikely that we will ever again see a case like *Momah* where there is effective, but not express, compliance with *Bone-Club*."). As stated in the five-justice majority in *Paumier*:

> Today's holding may seem in conflict with our previous decision in *Momah*, but it is not. As we made clear in *Wise*, *Momah* relied on unique facts to conclude that no public trial right violation occurred when the jurors were individually questioned. . . . Specifically, the defendant in

19

> *Momah* "affirmatively assented to the closure of voir dire and actively participated in designing the trial closure and [ ] though it was not explicit, the trial court . . . effectively considered the *Bone-Club* factors." *Wise*, 176 Wn.2d at [14].

*Paumier*, 176 Wn.2d at 35-36 (alterations in original). *Wise* described the "unique facts" of *Momah* thus: "[A]lthough the [trial] court erred in failing to comply with *Bone-Club*, the record made clear—without the need for a post hoc rationalization—that the defendant and public were aware of the rights at stake and that the court weighed those rights, with input from the defense, when considering the closure." *Wise*, 176 Wn.2d at 15.

Here, even more than in *Momah*, the trial court attempted to employ *Bone-Club* criteria, the record is clear that Mr. Copland and the public were aware of the public trial right, and the trial court weighed the interests of all in determining the least restrictive alternative. Even if the public trial issue had been raised on appeal, it appears likely that it would not have justified reversal of the conviction. The closure occurred to protect Mr. Copland's rights, did not actually prejudice him, and was not challenged by the public.

The public trial rights under the Sixth Amendment to the United States Constitution and article I, sections 10 and 22 of the Washington Constitution were not violated by the partial closure of the jury voir dire in this case. Even if a violation had occurred, Mr. Copland does not show actual and substantial prejudice to justify relief in

20

this petition. *Coats*, 173 Wn.2d at 132.

*New Evidence.* Mr. Copland next contends new material facts justify vacation of his conviction in the interests of justice. RAP 16.4(c)(3). He attaches the declarations of Kay Sweeney, a forensic scientist, and Dr. Emmanuel Lacsina, a forensic pathologist, who state that the lack of blood spatter or gun residue on Mr. Copland or his clothing shows that more likely than not he did not fire the gun that killed Mr. Anthis. In fact, these experts state, the presence and placement of blood spatter and gun residue on Mr. Anthis's arm and body indicate that he was holding the gun and shot himself. Mr. Copland claimed at trial that he could not remember what happened that day. He contends he could not have discovered this expert testimony before trial because he only learned of the possibility that Mr. Anthis shot himself when the State's expert—Dr. Daniel Selove—mentioned that possibility on the witness stand.

When raised as a ground for relief in a personal restraint petition, "newly discovered evidence" is subject to the same standards that apply to a motion for a new trial. *Benn*, 134 Wn.2d at 886 (quoting *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319, 868 P.2d 835 (1994)). The petitioner must show that the evidence was discovered after trial and could not have been discovered before trial in the exercise of due diligence. *Id.* (quoting *Lord*, 123 Wn.2d at 319-20). Here, Mr. Copland fails to show that he could

21

not have discovered the evidence before trial that Mr. Anthis shot himself. Ms. Sweeney subjected Mr. Copland's clothing to a microscopic examination and decided that no trace of blood or gun residue was present. Other than that test, she relied on evidence in the trial record to reach her conclusion. Dr. Lacsina agreed with her conclusion, based on the same evidence. Although Mr. Copland contends he could not discover this evidence earlier because Dr. Selove's medical report did not mention the possibility of a self-inflicted wound, the record shows that Mr. Copland had access to the same evidence and could have found the same experts before trial. In fact, defense counsel's first questions on cross-examination of Dr. Selove were whether the blood spatter on Mr. Anthis might suggest a self-inflicted wound.

A new expert opinion, based on facts available to the trial experts, does not constitute newly discovered evidence that could not, with due diligence, have been discovered before trial. *State v. Harper*, 64 Wn. App. 283, 293, 823 P.2d 1137 (1992) (citing *State v. Davis*, 25 Wn. App. 134, 138, 605 P.2d 359 (1980)). Thus, Mr. Copland fails to justify vacation of his conviction under RAP 16.4(c)(3). Relief is not justified under RAP 16.4(c)(3) for newly discovered evidence.

*Firearm Enhancement.* Finally, Mr. Copland contends the trial court erred in imposing a firearm enhancement when the charging document alleged possession of a

deadly weapon. The same issue was raised and rejected on appeal. *See Copland*, 2007 WL 2254420 at *4-5. Moreover, this issue was raised in an amendment filed after the statutory time limit and is not entitled to an exception to the one-year time bar. RCW 10.73.090(1), .100; *Benn*, 134 Wn.2d at 938-39.

Mr. Copland contends reexamination of the issue is required in the interests of justice. As discussed above in the standards of review, Washington courts have limited the relief considered in the "interests of justice" to cases where an intervening change in the law or some other circumstance justified the failure to raise a crucial argument on appeal. *Yates*, 177 Wn.2d at 17 (quoting *Stenson*, 142 Wn.2d at 720). Mr. Copland contends two new cases support reexamination of the issue on collateral review, citing *State v. Recuenco*, 163 Wn.2d 428, 180 P.3d 1276 (2008) and *State v. Bainard*, 148 Wn. App. 93, 199 P.3d 460, *review granted*, 166 Wn.2d 1010 (2009). Both cases are distinguishable. In *Recuenco*, the defendant was charged with second degree assault with a deadly weapon, "'to-wit: a handgun,'" but the special verdict form directed the jury to find whether he was armed with a deadly weapon. *Recuenco*, 163 Wn.2d at 431-32. Despite the jury's finding that the defendant was armed with a deadly weapon, the trial court erred by imposing a firearm enhancement. The facts in *Bainard* are similar: the jury found by special verdict that the defendant was armed with a deadly weapon, yet he

23

received the firearm enhancement. *Bainard*, 148 Wn. App. at 103-04.

Here, the jury was instructed to determine by special verdict whether Mr. Copland was armed with a firearm and he received a firearm enhancement. Even if *Recuenco* was relevant to Mr. Copland's argument, it does not apply retroactively to his judgment and sentence. *In re Pers. Restraint of Scott*, 173 Wn.2d 911, 920, 271 P.3d 218 (2012).

This untimely issue was raised and rejected on appeal and is without merit. No retroactive, intervening change in the law justifies relief in the interests of justice.

We dismiss the petition under RAP 16.11(b) as without merit.

_____
Kulik, J.

WE CONCUR:

_____          _____
Siddoway, A.C.J.                                              Brown, J.

24