# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Personal    )    No. 72685-4-I
Restraint Petition of    )
    )
    )
    )
    )
BRANDON JOSEPH EARL,    )    UNPUBLISHED OPINION
    )
           Petitioner.    )    FILED: April 4, 2016
    )

VERELLEN, J. — A forensic scientist's disciplinary records support a motion for new trial only if the newly discovered evidence would probably change the outcome of the trial. The State's failure to provide such records supports a Brady[1] violation only if the records are material.

Brandon Earl seeks a new trial for his first degree child rape conviction, relying upon newly discovered disciplinary records of the scientist who conducted deoxyribonucleic acid (DNA) testing of the victim's underwear. Earl contends the records destroy the scientist's credibility and undermine the foundation for admitting the DNA results. Earl also contends the State's nondisclosure of the scientist's disciplinary records violated Brady. The trial court transferred Earl's motion for new trial for consideration as a personal restraint petition.

But Earl fails to connect the scientist's mistakes to the reliability of the DNA results in this case. There is no showing that the scientist mishandled,

---

[1] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

contaminated, or failed to properly test the DNA evidence. The scientist's deficiencies identified in the disciplinary records are not exculpatory and do not destroy his credibility.

We deny Earl's personal restraint petition.

FACTS

On Christmas Eve 2010, Earl returned home from work to a family party.[2] He went upstairs to his bedroom to rest.[3] Several children were in his bedroom watching cartoons.[4] Earl gave the children "raspberries," i.e., blew on their stomachs, and sent them downstairs.[5] Three-year-old M.F. returned to Earl's bedroom.[6]

M.F.'s mother went upstairs to look for M.F. When she opened Earl's bedroom door, she "heard a bunch of commotion."[7] The mother saw Earl and M.F. next to each other on his bed.[8] Earl and M.F. separated quickly when the mother opened the door:

> I look around, and I can see Brandon coming from the left side of the bed, kind of readjusting, sitting up to the right side of the bed. The covers were over his bottom half, fully dressed. [M.F.] is more towards the foot of the bed on the left side.[9]

---

[2] Pet'r's Br., app. 2, at 4.

[3] Id.

[4] Id. at 25-26.

[5] Id. at 26, 29.

[6] Id. at 29.

[7] Report of Proceedings (RP) (Jan. 30, 2013) at 279.

[8] Id.

[9] Id.

2

The mother carried M.F. out of the room. While walking downstairs, M.F. said Earl "told me not to tell."[10]

The mother took M.F. into a bathroom and asked her what happened, but M.F. would not say.[11] She then took M.F. to sit next to M.F.'s grandmother.[12] M.F. told the grandmother, "He licked my pee-pee."[13] The grandmother asked who did, and M.F. answered, "Brandon."[14] When the mother confronted Earl later that night, he told her he "was blowing raspberries" or "butterflies" on M.F.'s belly.[15]

That night, M.F. told her mother before bedtime that Earl "made a mess down there."[16] M.F. changed into her pajamas, and the mother put M.F.'s clothing that she wore that night in a laundry hamper.[17]

Several days later, the mother took M.F. to a hospital for an examination.[18] The mother brought "a dress, a pair of tights, and two pairs of underwear" to the hospital.[19] The nurse examined M.F. and collected the clothes.[20] M.F. did not

---

[10] Id. at 284.

[11] Id. at 284-85.

[12] Id. at 286.

[13] Id. at 360.

[14] Id. at 362.

[15] Id. at 292-93, 365.

[16] Id. at 296.

[17] Id. at 295-96, 337-38; Interview of April Mathis (Dec. 14, 2012) at 72.

[18] (RP) (Jan. 30, 2013) at 394.

[19] Id. at 399. The record does not explain why the hamper contained only two pairs of underwear for the four days from Christmas Eve until the day the mother collected the clothes from the hamper.

[20] Id. at 399.

say anything to the forensic nurse about the previous night.[21]

Earl admitted to police that he was alone with M.F. on his bed, that he placed his mouth on her lower torso when "blowing raspberries," and his mouth was "accidentally" on her vagina or his face was in her private area for "thirty seconds."[22] Earl stated that while "blowing raspberries" involved contact with M.F.'s skin on her stomach, the contact with M.F.'s vaginal area was over her clothing.[23]

The State charged Earl with first degree child rape.

*Forensic DNA Testing*

M.F.'s tights and two pairs of underwear from the hamper were tested for DNA.[24] Forensic scientist Kristina Hoffman initially tested the items.[25] Hoffman did not notice anything "abnormal" or "compromised."[26] On one pair of underwear, amylase was found on the inside, but not the outside, of the crotch area.[27] Amylase is an enzyme found in saliva and in lower amounts in other bodily fluids.[28] Both pairs of underwear had "yellow staining" on the crotch area

---

[21] Id. at 397.

[22] Pet'r's Br., app. 2, at 27-28.

[23] Id. at 23.

[24] RP (Feb. 1, 2013) at 657, 660.

[25] Id. at 656-57.

[26] Id. at 658.

[27] Id. at 672-73, 678-79.

[28] Id. at 667.

4

and had a "urine-like odor."[29] Amylase was not found on the outside crotch area of the tights.[30]

On the underwear with amylase on the inside of the crotch, a "small amount" of male DNA, "seven nanograms," was found in the crotch area.[31] Hoffman did not determine how many male DNA profiles were on the underwear.[32] Hoffman testified that seven nanograms of DNA is more consistent with a "body fluid" deposit than a "contact touch" deposit.[33] Both male and female DNA were found on the outside crotch area of the tights, with a "mixture of at least four contributors."[34] Hoffman testified that 1 in 29 persons, including Earl and M.F., were possible contributors.[35] Due to the large amount of female DNA on the underwear, detecting the male component with conventional (autosomal) DNA testing was not possible.[36]

In October 2011, Hoffman sent an interior sample of the underwear that had amylase to another lab for Y-STR haplotype testing.[37] Hoffman testified that the packaging of Earl's and M.F.'s reference samples was an "acceptable method" and did not risk contamination.[38]

---

[29] Id. at 664, 671.

[30] Id. at 672-73, 678-79.

[31] Id. at 682-83, 694, 748.

[32] Id. at 758.

[33] Id. at 695-96.

[34] Id. at 686, 725-26.

[35] Id. at 686, 688, 726.

[36] Id. at 682, 759.

[37] Id. at 683, 709.

[38] Id. at 686, 705.

When forensic scientist Michael Lin received the samples, he did not observe "any potential break or compromise in the packaging."[39] In November 2011, Lin performed the Y-STR testing on the underwear. Y-STR testing isolates male DNA by focusing solely on the Y chromosome.[40] All men in the same paternal lineage share the same DNA profile.[41] Y-STR testing allows a forensic scientist to determine whether a known source and all of his paternal relatives can be excluded as possible contributors to an unknown DNA sample.[42]

M.F.'s underwear disclosed a Y chromosome DNA profile from "one individual" consistent with Earl's Y chromosome DNA profile.[43] Lin estimated the frequency of a particular profile found in the database using the "Counting Method."[44] This method compares the profile to a database maintained by the National Center for Forensic Sciences and determines the frequency of the profile found in the database.[45] Lin calculated the probability that a random person would exhibit the same profile as Earl's at less than 1 in 2,800.[46] This estimate was "highly conservative" due to the database's limited size.[47] As the

---

[39] Id. at 775.

[40] JOHN M. BUTLER, FORENSIC DNA TYPING: BIOLOGY & TECHNOLOGY BEHIND STR MARKERS 120 (2001).

[41] Id.

[42] State v. Bander, 150 Wn. App. 690, 700, 208 P.3d 1242 (2009).

[43] RP (Feb. 1, 2013) at 781, 795; RP (Feb. 4, 2013) at 838.

[44] RP (Feb. 4, 2013) at 819.

[45] RP (Feb. 4, 2013) at 820, 839.

[46] RP (Feb. 1, 2013) at 796; RP (Feb. 4, 2013) at 845.

[47] RP (Feb. 4, 2013) at 842, 845.

database grows, it provides a more specific calculation of the frequency of any particular profile.[48]

The database calculates a frequency by applying a 95 percent confidence interval.[49] Stated differently, the calculated profile would be within that range 95 percent of the time and would fall outside of that range 5 percent of the time.[50] More profiles were added to the database from the time Lin initially tested the underwear and the trial.[51] As of January 2013, Lin calculated the probability that a random person would exhibit the same profile as Earl's at less than 1 in 4,400.[52] During trial, the database had updated again, and Lin calculated the probability that a random person would exhibit the same profile as Earl's at less than 1 in 5,200.[53]

A jury convicted Earl of first degree child rape. He appealed, challenging the trial court's decision to exclude evidence that the mother and grandmother were predisposed to assume abuse occurred and alleging prosecutorial misconduct in closing argument. This court affirmed his conviction.

---

[48] Id. at 841; see also Justice Ming W. Chin, Michael Chamberlain, Amy Rojas, Lance Gima, Forensic DNA Evidence: Science and the Law § 7:1 (updated electronically April 2015) ("Because this estimate is dependent on the size of the database, the frequency estimate will change with the sample size of the database and the number of observances with each search.").

[49] RP (Feb. 4, 2013) at 842.

[50] Id. at 824.

[51] Id. at 849.

[52] Id. at 848, 874-75.

[53] Id. at 847-49, 902.

*Motion for New Trial*

One year after his conviction and during the pendency of his direct appeal, Earl filed a motion for new trial. Earl attached Lin's disciplinary records.

Lin was hired to work as a forensic scientist in February 2008. He was in training status until December 2009. Lin began performing supervised casework in January 2010. Lin completed the Y-STR testing in Earl's case in November 2011. In March 2013, Lin was removed from active case work pending completion of a work improvement plan. Three months later, Lin resigned.[54]

The trial court transferred Earl's motion for consideration as a personal restraint petition.

## ANALYSIS

Earl contends Lin's recently disclosed disciplinary records warrant a new trial under either the newly discovered evidence standard or the Brady materiality standard. We disagree.

Newly discovered evidence is grounds for relief in a personal restraint petition if those facts "in the interest of justice" require the conviction's vacation.[55] When raised as a ground for relief, "'newly discovered evidence' is subject to the same standards that apply to a motion for a new trial."[56] A party seeking a new trial based upon this ground must demonstrate the evidence:

---

[54] In his motion for new trial, Earl asserts that several facts identified in the opinion deciding his direct appeal are inaccurate. Misstatements or overstatements of any nature are a serious concern. For this personal restraint petition, we do not rely upon any misstatements identified by Earl.

[55] RAP 16.4(c)(3).

[56] In re Pers. Restraint of Copland, 176 Wn. App. 432, 450, 309 P.3d 626 (2013).

"'(1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching."[57] The absence of any one factor is grounds for the denial of a new trial.[58]

To establish a Brady violation, a defendant must establish three factors: the evidence "'must be favorable'" to the defense, either because it is exculpatory or impeaching, the evidence "'must have been suppressed by the State, either willfully or inadvertently,'" and the evidence "'must be "material."'"[59] Evidence is material under Brady if the State's "'evidentiary suppression undermines confidence in the outcome of the trial.'"[60]

Earl fails to establish either that evidence of Lin's general ineptitude would probably change the outcome of the trial or is material under Brady.

The Supreme Court's recent decision in State v. Davila is instructive.[61] There, the defendant was charged with felony murder after he allegedly killed a man with a baseball bat. Forensic scientist Denise Olson tested the bat for DNA. Olson's testing revealed the presence of Davila's DNA on the bat. At trial, the State did not call Olson to testify about her testing of the bat. Instead, the State

---

[57] State v. Mullen, 171 Wn.2d 881, 905-06, 259 P.3d 158 (2011) (quoting State v. Macon, 128 Wn.2d 784, 800, 911 P.2d 1004 (1996)).

[58] Id. at 906.

[59] State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (quoting Strickler v. Greene, 727 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

[60] Id. at 73 (internal quotation marks omitted) (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 Sup. Ct. 1555, 131 L. Ed. 2d 490 (1995)).

[61] 184 Wn.2d 55, 357 P.3d 636 (2015).

called her supervisor Lorraine Heath to testify about Heath's retesting of the bat. Heath's retesting of the evidence "confirmed Olson's results."[62] Davila was convicted of felony murder.

Before sentencing, the defense learned Olson had been fired "after receiving poor evaluations for roughly five years."[63] The defense also learned the crime lab audited Olson's work during the year she tested items in Davila's case.[64] This audit "revealed errors in the vast majority of Olson's cases" and "resulted in 'Brady letters' being sent to eleven prosecuting attorneys" notifying them of her "problems" and her "faulty results."[65]

The defendant sought a new trial, alleging a Brady violation. The trial court denied the motion for new trial, concluding "the defense failed to meaningfully connect Olson's ineptitude with the evidence used to convict Davila."[66] The defense "failed to develop facts showing that Olson's ineptitude and termination were material *in this case*."[67] Absent some evidence of potential contamination in Davila's case due to Olson's incompetence, the Davila court concluded the defense failed to show Brady materiality.[68]

Earl's theory is that Lin's general ineptitude, as revealed in the disciplinary records, calls into question the results of the DNA testing that Lin performed in

---

[62] Id. at 59.

[63] Id. at 61.

[64] Id.

[65] Id.

[66] Id. at 78.

[67] Id.

[68] Id. at 81-82.

this case. But Earl does not connect Lin's ineptitude with the results of the testing in this case.

Several of the records reveal initial performance problems and a resulting improvement plan implemented when Lin was still in training status in June 2009. This occurred several years before Lin's testing in Earl's case. For example, Lin missed deadlines, he inefficiently used expensive reagents, he used a pipette to mix sperm samples in a way that may have used up excessive amounts of a low-level sample, and he used a second slide in a test when it was not clear a second slide was required, which potentially wasted portions of the sample.[69] In December 2009, Lin successfully completed an improvement plan designed to address these concerns.[70]

The April 27, 2010 discipline involved the potential for contamination of evidence *in another case*.[71] For quality control in the use of paper that detects the presence of amylase, the scientists use a sample of their own saliva on a separate piece of paper to confirm the paper is working properly before applying another piece of that paper to screen evidence.[72] The crime lab also screens each test for any contamination of evidence with its lab workers' DNA.[73] There was no showing of any actual contamination with Lin's saliva in the April 27, 2010 screening or any other evidence at any other time. Lin acknowledged on cross-

---

[69] Resp't's Br., app. A-1.

[70] Id., app. C-1, C-2.

[71] Id., app. D-1.

[72] Id., app. 2-4, ¶ 8.

[73] Id., app. 2-2, ¶ 4.

examination that his test results revealed the presence of other scientists' DNA in two incidents.[74] If the April 27, 2010 disciplinary record had been made available before trial, the defense could have impeached Lin with evidence of this potential for contamination with Lin's saliva in the April 2010 incident. But no evidence supports that Lin has ever contaminated any evidence with reference samples or with his DNA.[75] Nor is there evidence of any repeated incidents involving potential or actual contamination of DNA samples.

Earl's theory of contamination is hypothetical and speculative. Before Lin tested M.F.'s underwear for male DNA, another scientist had determined that male DNA was present on the inside crotch area of M.F.'s underwear. That scientist extracted the male DNA from that pair of underwear. Lin's testing revealed a single male DNA profile. If the original DNA extracted from the underwear had been some other male's DNA, and Lin had contaminated that DNA sample with Earl's reference sample, then the testing would have revealed at least two male profiles present on the underwear.

Absent any evidence that Lin had ever contaminated evidence with reference samples, or that he contaminated the DNA extracted from M.F.'s underwear here, Earl fails to "meaningfully connect" Lin's ineptitude with the evidence used to convict him.[76] No evidence supports that Lin's ineptitude tainted the evidence or test results in this case. Nor is there any evidence that Lin forged lab results, or failed to properly use the machines that measure and

---

[74] RP (Feb. 4, 2013) at 852.

[75] Resp't's Br., app. 2-3, ¶ 5.

[76] Davila, 184 Wn.2d at 78.

analyze Y-STR samples. Similarly, the disciplinary records do not call into question the chain of custody or foundation for the DNA test results.[77]

The remaining disciplinary records supporting Earl's motion for new trial criticize Lin's testimony in this case.[78] Such criticism does not exculpate Earl. Heath criticized Lin because he failed to present as compelling a case against Earl as the evidence warranted and "significantly understate[d] the significance of the lab results."[79] For example, (1) Lin "tended to equivocate" and gave "unclear" and "unqualified answers," (2) Lin "often understated his training and experience and generally gave a poor, unconfident, unprepared impression to the jury and the judge," (3) Lin "gave the impression of being unfamiliar" with the case file, (4) Lin gave "the impression that contamination was more likely than it was," and (5) Lin failed to articulate that the amount of male DNA found on the underwear was inconsistent with a touch sample.[80]

Earl makes no showing that a reference hearing is warranted. He suggested the potential for a reference hearing to the trial court to "probably bring in the people that authored those documents."[81] But Earl "never offered any fact or called any witness who could have supported his theory" that Lin mishandled

---

[77] Earl relies upon State v. Roche, 114 Wn. App. 424, 59 P.3d 682 (2002), but Roche is distinguishable. No evidence here suggests Lin stole or altered test samples, lied to his supervisors or fabricated test results, compromised the DNA results in this case by his conduct, or used drugs while testing.

[78] Resp't's Br., apps. F, G, I, J, K.

[79] Id., app. 2-4, ¶ 11.

[80] Id., app. G; app. 2-4, ¶ 11.

[81] RP (Aug. 6, 2014) at 7.

or contaminated the evidence.[82] Earl provides no evidence that links Lin's ineptitude to the evidence in this case.

In context, the newly discovered evidence reveals that Lin did not work as quickly or efficiently as desired. In cases not involving Earl, he wasted expensive supplies and used techniques that could have wasted a limited sample. On one occasion in 2010, Lin *risked* contamination of evidence in another case with his own saliva sample. And Lin struggled to be a strong expert witness for the State.

But Earl fails to demonstrate that Lin's ineptitude implicates the validity of the DNA results in this case. Those results establish that there was a single male profile for the male DNA found on the inside crotch area of M.F.'s underwear containing amylase. Earl told police that his face "accidentally" touched M.F.'s vaginal area over her clothes.[83] But Hoffman found the amylase on the inside crotch area of M.F.'s underwear, not on the outside of the underwear or on the tights M.F. was wearing. The presence of amylase is consistent with the presence of Earl's saliva only on the inside of M.F.'s underwear and corroborates M.F.'s statement that Earl "licked [her] pee-pee."[84] Earl admitted his face or his mouth contacted M.F.'s private area for "thirty seconds."[85]

We acknowledge that the Y-STR evidence was significant, corroborating that Earl had direct contact with M.F. But the newly discovered evidence does

---

[82] Davila, 184 Wn.2d at 79.

[83] Pet'r's Br., app. 2, at 27-28.

[84] RP (Jan. 30, 2013) at 360.

[85] Pet'r's Br., app. 2, at 28.

14

not link Lin's ineptitude with the DNA test results. Under the Brady materiality standard, Earl does not establish grounds for relief. Earl fails to develop any facts, apart from speculation, supporting his theory that there is a reasonable probability of contamination *in this case* due to Lin's misconduct. For the same reasons, we conclude the newly discovered evidence would not probably change the result of the trial.

Therefore, we deny Earl's personal restraint petition.

WE CONCUR: