This opinion was filed for record
at 8:00 AM on Sept. 25, 2014

Ronald R. Carpenter
Supreme Court Clerk

FILE
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE **SEP 2 5 2014**

Madsen, C.J.
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80727-2 |
| Petitioner, | ) | (consolidated with 86513-2) |
| v. | ) | En Banc |
| BRIAN WILLIAM FRAWLEY, | ) | |
| Respondent. | ) | |
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) | |
| v. | ) | |
| RONALD EUGENE APPLEGATE, | ) | |
| Petitioner. | ) | |
| | ) | Filed **SEP 2 5 2014** |

C. JOHNSON, J.—These consolidated criminal cases involve whether a

defendant can waive his right to a public trial under article I, section 22 and/or

article I, section 10 of the Washington State Constitution. In *State v. Frawley*, 140 Wn. App. 713, 167 P.3d 593 (2007), the Court of Appeals reversed Brian Frawley's conviction for first degree felony murder because the trial court closed the courtroom without performing a *Bone-Club*[1] analysis. In *State v. Applegate*, 163 Wn. App. 460, 259 P.3d 311 (2011), the Court of Appeals affirmed a jury's determination of aggravating factors supporting Ronald Applegate's exceptional sentence for his 2005 conviction for rape of a child because the defendant waived his public trial right. In both cases, because the State has not established waiver, we affirm *Frawley* and should reverse *Applegate*.

## FACTS AND PROCEDURAL HISTORY

### a. State v. Frawley

In 2004, Brian Frawley was charged with first degree felony murder. At trial, voir dire was divided into two phases: individual and general voir dire. At the individual portion of voir dire, some jurors were to be questioned in the judge's chambers regarding their answers on the juror questionnaire. Before this occurred, the court engaged in an extensive colloquy concerning Frawley's right to be present for the individual voir dire and he waived this right to be present. The court

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

and counsel for both sides then interviewed 35 prospective jurors in chambers. Eleven prospective jurors were stricken for cause.

For the general voir dire, the court proposed closing the courtroom to the public out of concern that the space would not be large enough for both the venire and the public.[2] The court inquired into whether Frawley would waive his right to have the public present and eventually engaged Frawley in another extensive colloquy where the trial judge concluded that Frawley waived his right to have the public present during general voir dire. The jury was selected and eventually convicted Frawley of first degree felony murder.

On appeal, the Court of Appeals issued a split decision in which it held that (1) the trial court improperly closed the courtroom for the individual voir dire without performing a *Bone-Club* analysis and (2) Frawley did not waive his right to have the public present during individual voir dire. As a result, the Court of Appeals reversed Frawley's conviction. *Frawley*, 140 Wn. App. 713. The State petitioned this court for review, and consideration of the petition was deferred pending resolution of *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009), and *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), and then again pending resolution of *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). This court then

---

[2] The court had addressed the entire venire the day before without excluding the public by moving across the hall to a larger courtroom.

granted the petition for review. *State v. Frawley*, 176 Wn.2d 1030, 299 P.3d 19 (2013).

### b. *State v. Applegate*

In 1996, the State charged Ronald Applegate with second degree rape of a child. Applegate fled but was eventually arrested in 2004. He was convicted with three aggravating factors supporting an exceptional sentence, but his sentence was overturned on appeal and remanded for a new trial on the aggravating circumstances only.

Prior to voir dire at the new trial, the trial judge addressed the courtroom, asking if either party or any member of the public present in the courtroom[3] would object if individual potential jurors who wanted to could discuss issues raised in the juror questionnaire in a "less open setting." *Applegate* Report of Proceedings (RP) (Aug. 10, 2009) at 26. Defense counsel stated that such a determination was entirely within the court's discretion, but the State indicated that the court needed to address whether Applegate himself objected because "[t]he public would be excluded under the circumstances." RP (Aug. 10, 2009) at 26. The court responded, "Under Momah, as I recall, it didn't even state that the factors need to be specifically addressed, because it still is a trial of record. We can still address

---

[3] The State indicated that there was one member of the public present in the courtroom. It does not appear that this individual voiced an objection.

those factors[4] at another time." RP (Aug. 10, 2009) at 27. The discussion was then tabled until the court could address the entire jury pool later that afternoon.

After voir dire had started, the court identified one juror likely to be questioned privately based on the questionnaire.[5] The court addressed the courtroom again, asking if any member of the jury pool or public had any objection to the court speaking with the juror in chambers. The court explained, "It would be a public proceeding. Any member of the public that is available to come in [it] will have the outer door open for that purpose."[6] RP (Aug. 10, 2009) at 118. The court again asked if there were any objections, but the State voiced concern that Applegate had yet to state whether he objected. The court stated, "[I]n terms of I believe the five factors set forth[,] referred to as the [*Bone-Club*] factors[,] I believe those have been met." RP (Aug. 10, 2009) at 119. The court then asked if Applegate had any objections. Initially, Applegate's attorney stated that he had no objection, but the court sought clarification that Applegate himself rather than just

---

[4] The court appeared to be referring to the five factors set out in *Bone-Club*.

[5] Four jurors wished to speak privately regarding the questionnaire, but as the court indicated, three were near the end of the panel and unlikely to be selected. The remaining juror was near the beginning of the panel and was more likely to be selected.

[6] The court stated multiple times throughout this discussion and at the in-chambers questioning of the juror that the individual questioning had to and did remain a public proceeding. During the in-chambers questioning, the judge stated for the record, "The inner and outer door to my chambers are open. The courtroom door is closed, but this must remain a public proceeding." RP (Aug. 10, 2009) at 120.

his counsel did not object. Defense counsel then had a brief sidebar with Applegate and returned on the record to state, "I have talked it over with Mr. Applegate. He has no objection . . . to going back into chambers and asking these questions without the public hearing." RP (Aug. 10, 2009) at 119. The juror was briefly questioned in chambers by both parties, and then all returned to the courtroom to continue voir dire. The juror was impaneled, and the jury eventually returned a special verdict finding each aggravating factor supporting an exceptional sentence of 120 months.

The Court of Appeals affirmed Applegate's exceptional sentence. *Applegate*, 163 Wn. App. 460. Applegate then sought review from this court, alleging multiple errors. This court granted review on the public trial issue only and requested additional briefing as to whether any violation of Applegate's public trial right was de minimis. *State v. Applegate*, 176 Wn.2d 1032, 299 P.3d 19 (2013). The American Civil Liberties Union of Washington, Allied Daily Newspapers of Washington, Washington Newspaper Publishers Association, and Washington Coalition for Open Government joined in filing a brief as amici curiae in both cases.

ANALYSIS

*a.* Bone-Club *Analysis*

In *Wise* and *State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012), this court solidified the role of the public trial right in the context of the voir dire phase of a trial. The public trial right is found in two sections of the Washington constitution: article I, section 22, which guarantees a criminal defendant a right to a "public trial by an impartial jury," and article I, section 10, which guarantees that "[j]ustice in all cases shall be administered openly." The public trial right applies to jury selection, including the individual questioning of prospective jurors, *Wise*, 176 Wn.2d at 11, but the right is not absolute, *Bone-Club*, 128 Wn.2d at 259. A trial court may question potential jurors individually outside of the public's presence—thereby closing the courtroom—but only after considering the five *Bone-Club* factors[7] on the record. *Wise*, 176 Wn.2d at 13. Closure of the courtroom without this analysis is a structural error for which a new trial is the only remedy. *Wise*, 176 Wn.2d at 15.

---

[7] These factors are (1) the proponent of closure must show a compelling interest, and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "'serious and imminent threat'" to that right; (2) anyone present when the closure motion is made must be given an opportunity to object to the closure; (3) the proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests; (4) the court must weigh the competing interests of the proponent of closure and the public; and (5) the order must be no broader than necessary in application or duration. *Bone-Club*, 128 Wn.2d at 258-59 (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210, 848 P.2d 1258 (1993)).

In *Wise*, the trial court initiated in-chambers questioning of 10 jurors but did not analyze the *Bone-Club* factors on the record. We reversed Wise's conviction, holding that the trial court violated his right to a public trial by implementing a closure without first engaging in a *Bone-Club* analysis.

Similar to *Wise*, the trial courts here did not perform the *Bone-Club* analysis on the record. In *Frawley*, the trial court made no mention of the *Bone-Club* factors. In *Applegate*, although the trial judge stated on the record that he had analyzed the *Bone-Club* factors and twice asked the courtroom if Applegate or any member of the public objected, he failed to articulate a compelling interest for the closure, weigh this compelling interest against any competing interests, or consider alternatives such that the closure was the least restrictive means of protecting any threatened interest and no broader than necessary.

The articulation of a compelling interest ensures that court proceedings are not closed merely for the sake of convenience as a matter of course. *See Presley v. Georgia*, 558 U.S. 209, 215, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010). Weighing this compelling interest against competing interests ensures that trial courts give due consideration to the interests furthered by maintaining an open proceeding, such as fostering public confidence in the system and the appearance of fairness. Considering alternatives to closure is imperative—even when neither party has

8

offered an alternative—because "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Presley*, 558 U.S. at 214 (alteration in original) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)). In light of the important purpose served by each factor, it would be counterintuitive to hold that a trial judge's obligation to articulate and assess every *Bone-Club* factor on the record is excused by a single statement that he believed that the factors "ha[d] been met." RP (Aug. 10, 2009) at 119.

In both cases, the in-chambers questioning of jurors constituted a closure of the courtroom under *Wise*, 176 Wn.2d 1.[8] In neither case did the trial court analyze each *Bone-Club* factor on the record prior to instituting the closure. Both closures, therefore, were a violation of each defendant's public trial right.

### b. Affirmative Waiver

In both cases, the State argues that the defendant affirmatively waived his public trial right and therefore cannot challenge the closure. The State in *Applegate* further argues that because Applegate affirmatively waived his right to a public

---

[8] There may be an argument that no closure occurred in *Applegate* because of the trial judge's statements on the record that the in-chambers questioning would be a "public proceeding" and that any member of the public could view the proceeding. RP (Aug. 10, 2009) at 118. Because the State in *Applegate* did not assert this argument, we decline to address the issue.

trial and does not have standing to assert a violation of the public's right to a public trial, he has no claim to assert.

A "waiver" is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Courts "indulge every reasonable presumption against waiver of fundamental rights," *City of Bellevue v. Acrey*, 103 Wn.2d 203, 207, 691 P.2d 957 (1984) (citing *Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942)), and the prosecution bears the burden of establishing a valid waiver, *State v. Wicke*, 91 Wn.2d 638, 645, 591 P.2d 452 (1979). In general, the waiver of a constitutional right must be made knowingly, voluntarily, and intelligently, *State v. Thomas*, 128 Wn.2d 553, 558, 910 P.2d 475 (1996), but waivers of different constitutional rights meet this standard in different ways. *Compare Thomas*, 128 Wn.2d at 559 ("As with the right to self-representation, the right not to testify, and the right to confront witnesses, the judge may assume a knowing waiver of the right from the defendant's conduct."), *with City of Seattle v. Williams*, 101 Wn.2d 445, 452, 680 P.2d 1051 (1984) (knowing waiver requires defendant be informed of his constitutional right to a jury trial, and if the right is waived, he must be afforded a certain number of days in which to change his mind); *State v. Stegall*,

124 Wn.2d 719, 725, 881 P.2d 979 (1994) ("[T]he inquiry by the court will differ depending on the nature of the constitutional right at issue.").

In *Strode*, this court suggested that because a defendant's article I, section 22 public trial right is part of the same constitutional provision as the defendant's right to a jury trial, it should be subject only to waiver in the same manner. *Strode*, 167 Wn.2d at 229 n.3. A waiver of the right to a jury trial does not require a colloquy or on-the-record advice as to the consequences of a waiver, but it does require an affirmative and unequivocal personal expression of waiver from the defendant. *Stegall*, 124 Wn.2d at 725 (citing *Acrey*, 103 Wn.2d 203 at 207-08). Our court rules have formalized this process by requiring a written waiver from the defendant. CrR 6.1(a) ("Cases required to be tried by jury shall be so tried unless the defendant files a written waiver of a jury trial, and has consent of the court."). Therefore, a knowing, voluntary, and intelligent waiver of the public trial right would require, at the very least, a written waiver signed by the defendant expressly acknowledging and waiving the right. No such procedure was followed in these cases, and the record in these cases does not reveal an equivalent colloquy that satisfies this standard.

In Frawley's case, no dispute exists that Frawley was advised of his right to be present during individual voir dire. The question then becomes if and how a

11

waiver of his right to be present affects his right to have the public present. The State argues that the underlying purpose of questioning individual jurors—to further juror candor, thus promoting the defendant's right to an impartial jury—would be defeated if Frawley's waiver of his right to be present did not also implicitly waive his right to have the public present. We disagree.

In *In re Personal Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012), we discussed and resolved this argument. In that case, similar to what occurred in *Frawley*, the defendant waived his presence for the in-chambers questioning of individual jurors in order to promote juror candor. Our plurality opinion held that waiver of the right to be present should not be conflated with waiver of the right to a public trial because waiver of the former does not necessarily imply knowledge of the latter. We found no discussion of the defendant's public trial right before the closure and thus no waiver of the public trial right.

In Frawley's case, because the trial court made no mention of Frawley's public trial right before the individual juror questioning—only his right to be present—*Morris* controls. We cannot equate a waiver of the right to be present

with a waiver of the right to a public trial; we require an independent knowing, voluntary, and intelligent waiver of the public trial right.[9]

The record in *Applegate* also does not support finding a knowing and intelligent waiver. Although defense counsel, upon request from the trial judge, consulted with Applegate before stating that Applegate had no objection to in-chambers juror questioning, no indication was given that Applegate was informed of his right to a public trial or any consequences associated with waiving that right. Thus, neither Frawley nor Applegate made a knowing, voluntary, and intelligent waiver of their right to a public trial provided by article I, section 22.

While it may be true that a closure should not be subject to challenge on appeal when there is a valid affirmative waiver of a defendant's article I, section 22 public trial rights, it is necessary to emphasize that the doctrine of affirmative waiver is inconsistent with the *Bone-Club* analysis. This is the case because the *Bone-Club* analysis already incorporates a waiver analysis as the second factor, which explicitly compels the trial court to ask if anyone objects to the closure.

Allowing a closure with only an affirmative waiver by the defendant—and no *Bone-Club* analysis—negates the very purpose of requiring a *Bone-Club*

---

[9] Because we find no waiver as to the individual portion of voir dire, we need not assess whether the trial court's colloquy with Frawley concerning general voir dire could have constituted waiver.

13

analysis, which is to ensure that the trial court "resist a closure . . . except under the most unusual circumstances." *Bone-Club*, 128 Wn.2d at 259. We confine closures to the "most unusual circumstances" in order to protect both the defendant's *and* the public's right to an open trial. *Wise*, 176 Wn.2d at 16 (citing *State v. Easterling*, 157 Wn.2d 167, 174-75, 137 P.3d 825 (2006)). If a trial court allows a closure without applying the *Bone-Club* factors—i.e., without finding a compelling interest justifying the closure or considering alternatives such that the closure is the least restrictive means of protecting that compelling interest—the public's right to a public proceeding is implicated and remains implicated even where a defendant could be found to have knowingly, voluntarily, and intelligently waived *his or her* right to have the public present. Because a courtroom closure implicates both the public's interest in openness under article I, section 10 and the defendant's interests under article I, section 22, a constitutional violation exists absent proper justification for the closure (as required by *Bone-Club*) even though we have recognized that under some circumstances, a new trial is not always required to remedy that constitutional violation.

Further, the public does not waive its right to have "[j]ustice . . . administered openly," WASH. CONST. art. I, section 10, simply because no member of the public objected to the closure. "The public has a right to be present whether

or not any party has asserted the right." *Presley*, 558 U.S. at 214. Allowing a criminal defendant to affirmatively waive his public trial rights could now allow a defendant to consent to locking the courtroom door for the entirety of his criminal trial. Just because a valid affirmative waiver renders a closure free from challenge on appeal should not mean that the error does not occur to the detriment of others.

### c. Contemporaneous Objection

The State in *Frawley* also argues that under the Rules of Appellate Procedure, a party can claim an error for the first time on review only if the error is "manifest error affecting a constitutional right." RAP 2.5(a)(3). Such a rule, however, would require this court to overrule many of our cases holding that a party may claim a public trial right error for the first time on appeal. *See Paumier*, 176 Wn.2d at 36-37; *Wise*, 176 Wn.2d at 15; *Easterling*, 157 Wn.2d at 173 n.2. This court will overrule an established rule only if a party can show that the rule is incorrect and harmful. *City of Federal Way v. Koenig*, 167 Wn.2d 341, 346-47, 217 P.3d 1172 (2009) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004)). The State has made no showing that the rule in *Wise*, *Paumier*, *Easterling*, and other cases is incorrect or harmful.

Our public trial jurisprudence has made clear that proceedings to which the public trial right attaches must be kept open and public. The exception to this rule

allows courts to institute closures only when necessary, on a case-by-case basis, after performing the *Bone-Club* analysis. Requiring a contemporaneous objection in order to preserve a public trial error for review would have the opposite effect. Under such a rule, a trial court could permit a closure whenever the defendant did not object, except for situations in which the closure was "manifest" error, as defined by a common law approach. In practice, such a rule would create a perception of trial proceedings that could be presumptively closed, with open proceedings serving as the exception to the rule. This is inconsistent with our public trial rights jurisprudence, and we decline to overrule the long-standing rule that public trial rights violations may be asserted for the first time on appeal.

### d. De Minimis

Lastly, Frawley and Applegate argue that any violation of their public trial right was not de minimis. Specifically, they point out that only federal cases have recognized a de minimis analysis for public trial rights violations. Analyzing the *Gunwall*[10] factors, Applegate argues that the Washington public trial right is broader and more protective than the federal public trial right.

A *Gunwall* analysis, however, is unnecessary here. While we have relied upon and incorporated various aspects of federal law in developing our public trial

---

[10] *State v. Gunwall*, 106 Wn.2d 54, 720 P.3d 808 (1986).

right jurisprudence, we are solely within the realm of interpreting the state constitution. We do not require *Gunwall* to take us any further. Looking to Washington law, even if the brief in-chambers questioning of one juror could constitute a de minimis violation of a defendant's public trial right, such a conclusion would find no place in our public trial rights case law. We have considered a de minimis argument in the context of public trial rights in past cases, and in *Easterling*, 157 Wn.2d at 180, we expressly rejected a de minimis approach as advocated for in the dissenting opinion. We have not deviated from this holding. Thus, in both cases here, the closures were not de minimis.

## CONCLUSION

An open and public trial serves as a "core safeguard in our system of justice," providing accountability and transparency and allowing the "public to see, firsthand, justice done in its communities." *Wise*, 176 Wn.2d at 5, 6. People not actually attending trials can be confident that courts are observing standards of fairness, knowing that because anyone is free to attend, established procedures are being followed and deviations will become known. *Press-Enter. Co.*, 464 U.S. at 508. Closures of the courtroom should be instituted only in the rarest of circumstances, as dictated by an on-the-record analysis of the *Bone-Club* factors.

*State v. Frawley*, 80727-2 (consol. with 86513-2)

We affirm the Court of Appeals in *Frawley* and should reverse in *Applegate*, and we should remand both cases for further proceedings.

WE CONCUR:

18

80727-2

Stephens, J. (concurring)—The lead opinion correctly recognizes that the in-chambers voir dire in these cases was a closure that violated Brian Frawley's and Ronald Applegate's public trial rights. And, it correctly concludes that neither defendant waived his right to challenge the closure under our constitutional waiver standard. I therefore concur in the lead opinion's holding that "neither Frawley nor Applegate made a knowing, voluntary, and intelligent waiver of their right to a public trial provided by article I, section 22." Lead opinion at 13.

Unfortunately, the lead opinion clouds the clarity of this holding by going on to suggest that the very waiver analysis it applies is inconsistent with our *Bone-Club*[1] analysis. I respectfully disagree. Whether a defendant waives his right to assert a constitutional error presents a different question from whether such error occurs; no error occurs when a court validly closes a proceeding under the *Bone-Club* analysis. But, even in the absence of a full *Bone-Club* analysis, a defendant is entitled to waive his right to an open court, if the waiver meets the constitutional

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

standard for waiver. There is nothing so unique about the public trial right under article I, section 22 of the Washington Constitution or the Sixth Amendment to the United States Constitution that makes it categorically unwaivable. On this score, I agree with much of the analysis set forth in Justice Gordon McCloud's concurrence/dissent. I cannot join her opinion, however, because the waivers presented in both of these cases failed to meet the constitutional waiver standard.

There can be little doubt as to Mr. Frawley's case. Regardless of whether Mr. Frawley may have ultimately waived his right to a public trial on the record, this occurred *after* the court had conducted individual voir dire in chambers and applied only to remaining portions of voir dire. *Compare* 1 Verbatim Report of Proceedings (VRP) (Nov. 28, 2005) at 67-68 (waiving only right to presence for individual voir dire in chambers), *with* 6 VRP (Feb. 14, 2006) at 864-67 (waiving public trial right for remainder of voir dire). Mr. Applegate's case is less clear. He indicated, through counsel, that he had no objection to in chambers voir dire, but the discussion that preceded the conversation between the court and counsel concerning Applegate's waiver was confused at best and misstated the law at worst.

Critically, the judge indicated that the voir dire of jurors in chambers would be public:

> Is there any member of the jury panel or any member of the public who is
> present who has an objection to our speaking with juror No. 2 I guess in my

office?  It would be a public proceeding.  Any member of the public that is available to come in I will have the outer door open for that purpose.

*Appelgate* Report of Proceedings (Aug. 10, 2009) at 118.  Applegate's counsel and

the judge then had the following exchange:

> THE COURT:  Mr. Nelson, do you or your client have any objection to --
> MR. NELSON:  No.
> THE COURT:  Are you speaking for yourself and for your client?
> MR. NELSON:  I'm not speaking for my client.  I'm speaking for myself as his counsel.  I don't know if he heard.
> THE COURT:  All right.  Well, we have addressed it previously. I'll let you step into my office to discuss it with him.
> MR. NELSON:  Could I first have a side bar with your Honor?
> THE COURT:  Yes.
> (Side bar.)
> MR. NELSON:  Thank you, your Honor.  For the record, I have talked it over with Mr. Applegate.  He has no objection and I have no objection to going back into chambers and asking these questions without the public hearing.
> THE COURT:  It must remain a public proceeding.  So I will open the doors to my office.

*Id.* at 119-20.

As the lead opinion notes, the State does not argue that the in-chambers voir

dire was actually a public proceeding.  Lead opinion at 9 n.8.  Nor would this be

consistent with our precedent.  *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012);

*State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012).  Nonetheless, the trial

court's insistence that the in-chambers proceeding was not a closure strongly

suggested that no public trial right was even implicated.  Based on this advisement,

I find it impossible to conclude that Applegate made a "knowing" and "intelligent"

decision to "waive" his right.

I think it is important to recognize that public trial rights, like other important trial rights, are waivable. The presence or absence of a *Bone-Club* analysis is not determinative of whether a defendant will be allowed to challenge a violation of article I, section 22. It is equally important to recognize that a waiver is valid only when knowingly, intelligently, and voluntarily made, and this must be clear in the record. With these observations, I wholly agree with the lead opinion's conclusion that neither Frawley nor Applegate waived his public trial right.

Stephens, J.

Fairhurst, J.

No. 80727-2

GORDON McCLOUD, J. (concurring in part and dissenting in part)—I completely agree with the lead opinion that the in-chambers voir dire in both *Frawley* and *Applegate* constituted courtroom closures; the closures in both cases occurred without the explicit, on-the-record five-factor inquiry and balancing that the state constitution and our cases require; this constitutional error can be raised for the first time on appeal; and, the remedy for a reviewable error of this sort is reversal without any additional showing of prejudice to the outcome of the case. I also agree with the lead opinion that a defendant's waiver of this right cannot be presumed from a silent record, from a waiver of some other right, or from the defendant's decision to participate in a proceeding once the court has closed it to the public and the defendant has to make the best of the situation.

1

I write separately because I believe that a criminal defendant has the ability to affirmatively waive the right to raise the issue of courtroom closure on appeal or collateral challenge. The lead opinion acknowledges that this is a theoretical possibility, but says that it essentially requires a full *Bone-Club*[1] analysis. Lead opinion at 13 ("While it may be true that a closure should be subject to challenge on appeal when there is a valid affirmative waiver of a defendant's article I, section 22 public trial rights, it is necessary to emphasize that the doctrine of affirmative waiver is inconsistent with the *Bone-Club* analysis. This is the case because the *Bone-Club* analysis already incorporates a waiver analysis as the second factor, which explicitly compels the trial court to ask if anyone objects to the closure.").

I respectfully disagree. I think the defendant can waive the right to an open court, if the waiver meets the constitutional standard for waiver. I believe that Applegate's waiver met that standard and Frawley's did not. I therefore concur in the lead opinion's decision in *Frawley* but dissent from its decision in *Applegate*.

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

ANALYSIS

The lead opinion essentially rules that a criminal defendant's right to an open courtroom is nonwaivable without a *Bone-Club* analysis. As discussed immediately above, the lead opinion states that accepting a waiver is completely inconsistent with *Bone-Club*: "This is . . . because the *Bone-Club* analysis already incorporates a waiver analysis as the second factor, which explicitly compels the trial court to ask if anyone objects to the closure." Lead opinion at 13. "Allowing a closure with only an affirmative waiver by the defendant—and no *Bone-Club* analysis—also negates the very purpose of requiring a *Bone-Club* analysis . . . ." Lead opinion at 13-14.

It is certainly true that some constitutional rights are nonwaivable. For example, there are good systemic, as well as individual, reasons for the rule that a criminal defendant cannot waive the right to receive a sentence free from taint by a "'constitutionally impermissible factor such as race.'" *United States v. Johnson*, 410 F.3d 137, 151 (4th Cir. 2005) (quoting *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992)); *see also In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002) ("in general a defendant cannot waive a challenge to a miscalculated offender score").

Similarly, a criminal defendant cannot force a waiver of the constitutional right to conflict-free counsel on the court. *Wheat v. United States*, 486 U.S. 153, 154, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); *State v. Rooks*, 130 Wn. App. 787, 799-800, 125 P.3d 192 (2005). And a criminal defendant cannot waive the right to appeal or collaterally challenge his conviction on the ground of ineffective assistance. *Jones v. United States*, 167 F.3d 1142, 1145 (7th Cir. 1999); *United States v. Abarca*, 985 F.2d 1012, 1014 (9th Cir. 1993) (citing *Marin*, 961 F.2d at 496). Further, a criminal defendant cannot waive the right to competency or to sentencing within the statutory maximum authorized by the legislature. *See Pate v. Robinson*, 383 U.S. 375, 384, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) (defendant whose competence is subject to doubt cannot be deemed to have waived right to competency hearing (citing *Taylor v. United States*, 282 F.2d 16, 23 (8th Cir. 1980)); *Marin*, 961 F.2d at 496 (right to be sentenced within statutory maximum is nonwaivable). Both the defendant and the criminal justice system benefit from treating these protections as nonwaivable.

The criminal defendant's right to an open courtroom is just as constitutional, but it is different. All the jurisdictions of which I am aware

4

treat it as a waivable right. *E.g., Singer v. United States*, 380 U.S. 24, 35, 85 S. Ct. 783, 13 L. Ed. 2d 630 (1965);[2] *People v. Lang,* 49 Cal. 3d 991, 782 P.2d 627, 651, 264 Cal. Rptr. 386 (1989) (citing *People v. Cash,* 52 Cal. 2d 841, 846, 345 P.2d 462 (1959)); *People v. Marathon,* 97 A.D.2d 650, 650, 469 N.Y.S.2d 178 (1983); *Commonwealth v. Williams,* 379 Mass. 874, 401 N.E.2d 376, 378 (1980); *Wright v. State,* 340 So. 2d 74, 79-80 (Ala. 1976).

All of our cases have treated the public trial right as a waivable right, also. But they diverge on how it can be waived.

Most of our cases hold that a mere failure to object to a closure does *not* waive the right to a public trial. In *Bone-Club* itself, for example, this court rejected the State's argument that the defendant waived his right to an open court by failing to object to closure, explaining that "an opportunity to object has no 'practical meaning' unless the court informs the potential objectors of the nature of the asserted interests." *Bone-Club,* 128 Wn.2d at 261 (quoting *Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 39, 640 P.2d 716 (1982)). The court therefore concluded, "The summary closure thus

---

[2] To be sure, though, they differ about what it takes to waive the right. *Compare Walton v. Briley,* 361 F.3d 431, 434 (7th Cir. 2004) (requiring knowing and voluntary waiver), *with Martineau v. Perrin,* 601 F.2d 1196, 1200 (1st Cir. 1979) (failure to object may constitute waiver where the defendant is, on the record, made aware of his rights and declines to object).

deprived Defendant of a meaningful opportunity to object." *Id.* (citing *Ishikawa*, 97 Wn.2d at 39).

We came to a similar conclusion in *State v. Easterling*, 157 Wn.2d 167, 137 P.3d 825 (2006). In response to the State's argument that Easterling had waived his right by failing to object, we ruled that "under the *Bone-Club* criteria, the burden is placed upon the trial court to seek the defendant's objection to the courtroom closure." *Id.* at 176 n.8. Because the "record . . . . show[ed] that the trial court did not affirmatively provide Easterling with such an opportunity," the court concluded that Easterling did not waive his public trial right by silence. *Id.*

We took the same approach in *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009). The lead opinion in that case, signed by four justices, stated, "It seems reasonable . . . that the right to a public trial can be waived only in a knowing, voluntary, and intelligent manner." *Id.* at 229 n.3 (citing *City of Bellevue v. Acrey*, 103 Wn.2d 203, 207-08, 691 P.2d 957 (1984)). The concurrence, signed by two justices, stated that "[i]f the lead opinion means that only an on-the-record colloquy showing such a waiver will suffice, I disagree. Waiver of many important constitutional rights may

occur without an on-the-record colloquy." *Id.* at 235 (Fairhurst, J., concurring). The concurrence concludes, however, that Strode did not waive his public trial right because "[t]he record does not show a knowing waiver of the right to a public trial." *Id.*

Finally, in *Morris*, we again rejected the State's waiver-by-silence argument: "[A] defendant must have knowledge of a right to waive it. Here, there was no discussion of Morris's public trial right before the closure. Thus, we do not find that Morris waived his right to a public trial." *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 167, 288 P.3d 1140 (2012) (citation omitted) (citing *State v. Duckett*, 141 Wn. App. 797, 806-07, 173 P.3d 948 (2007)).

*Bone-Club* thus requires a "meaningful opportunity to object" before waiver will be inferred. *Easterling* and *Morris* do too. *Strode* clarifies that the waiver must be knowing, voluntary, and intelligent but adopts no formula for ensuring that standard is met; the concurring justices acknowledge that it can be met without the same type of "on-the-record colloquy" that waiver of certain other rights (like the right to counsel) requires.

Applying those precedents here, Applegate got the right to object to courtroom closure, got to "talk[] it over" with his own (presumptively effective) lawyer, and provided his answer, through counsel, that he did not object.[3] Frawley did not have such an opportunity.[4]

---

[3] After discussing the public trial right and the parties' desire to have a private proceeding in chambers, Applegate's counsel and the judge had the following exchange:

> COURT: Mr. Nelson, do you or your client have any objection to --
>
> MR. NELSON: No.
>
> COURT: Are you speaking for yourself and for your client?
>
> MR. NELSON: I'm not speaking for my client. I'm speaking for myself as his counsel. I don't know if he heard.
>
> COURT: All right. Well, we have addressed it previously. I'll let you step into my office to discuss it with him.
>
> MR. NELSON: Could I first have a side bar with your Honor?
>
> COURT: Yes.
>
> (Side bar.)
>
> MR. NELSON: Thank you, your Honor. For the record, I have talked it over with Mr. Applegate. He has no objection and I have no objection to going back into chambers and asking these questions without the public hearing.

*Applegate* Report of Proceedings (Aug. 10, 2009) at 119.

There are good reasons to stick with our precedent holding that the criminal defendant can waive this right and that he or she can do it without the court going through the five-factor *Bone-Club* analysis. The first reason is based in logic: *Bone-Club* is a means of protecting the right to an open court; waiver is a means of relinquishing the defendant's ability to raise an error concerning the right post-conviction. The second reason is based in policy: a criminal defendant might conclude that temporary closure is more beneficial to his case, or his safety, even if he cannot prove it. For example, a defendant might seek privacy to disclose the fact, and details, of his or her own agreement to cooperate with the government—even if he or she can't *prove* the certainty of negative consequences that would compel closure under *Bone-Club*.

What does it take for a criminal defendant to waive the right to raise a courtroom closure on appeal or in a collateral challenge? The lead opinion analogizes the right to an open courtroom to the right to a jury (as opposed to a bench) trial and says that the former can be waived in the same manner

---

[4] Frawley waived his right to a public trial on the record, but only after the court had conducted individual voir dire in chambers. *Compare* 1 Verbatim Report of Proceedings (VRP) (Nov. 28, 2005) at 67-68 (waiving only right to presence for individual voir dire in chambers), *with* 6 VRP (Feb. 14, 2006) at 864-67 (waiving public trial right for remainder of voir dire).

as the latter. The lead opinion relies on *Strode* for this analogy. Lead opinion at 11.

I agree that the analogy is apt and workable. But I disagree with the lead opinion's description of how to properly waive both of those rights. The lead opinion states that a defendant cannot waive jury without doing so personally, on the record, in writing or following an on-the-record advisement of rights. Lead opinion at 11 ("a . . . waiver of the public trial right would require, at the very least, a written waiver signed by the defendant expressly acknowledging and waiving the right" or "an equivalent colloquy that satisfies this standard").

It is true that a criminal defendant cannot waive a jury trial by silence or inaction. "[W]e have refused to infer a waiver when the record shows less than an affirmative, unequivocal waiver by defendant." *Acrey*, 103 Wn.2d at 207. We have, however, said different things about whether the defendant must personally say this to the judge in open court or if the lawyer can waive the right when the circumstances show that the defendant is adopting the lawyer's statements about the defendant's intent. *Compare State v. Wicke*, 91 Wn.2d 638, 644-45, 591 P.2d 452 (1979) (no effective

waiver of jury trial where no written waiver and attorney orally waives jury trial right in open court; court suggests that record must affirmatively show attorney was authorized to waive right on defendant's behalf), *and City of Seattle v. Crumrine*, 98 Wn.2d 62, 653 P.2d 605 (1982) (no written or oral waiver by defendant on the record; conviction reversed), *and City of Seattle v. Williams*, 101 Wn.2d 445, 452, 680 P.2d 1051 (1984) (conditional jury trial waiver at arraignment must be done by defendant in writing), *with State v. Stegall*, 124 Wn.2d 719, 729, 881 P.2d 979 (1994) (waiver of right to 12-person jury valid only if record shows "(1) a personal statement from the defendant expressly agreeing to the waiver, *or (2) an indication that the trial judge or defense counsel has discussed the issue with the defendant prior to the attorney's own waiver*" (emphasis added)).

As this list of cases shows, our most recent decision on this issue holds that a statement on the record by defense counsel can support a waiver when the record, fairly read, indicates that the defendant knew, heard, understood, and agreed with what the lawyer was saying. *Stegall*, 124 Wn.2d at 731 (no valid waiver where attorney waives right to 12-person jury on the record in open court where the issue "arose suddenly" and there was

11

no indication that counsel and client conferred on the point, but there was indication that counsel waived a full jury "to avoid the embarrassment of proceeding with jury selection with a broken zipper on his fly").[5] That describes what happened in Applegate's case, but it does not describe what happened in Frawley's case.

## CONCLUSION

I concur in the lead opinion's decision to affirm the Court of Appeals' decision to reverse the conviction in *Frawley*. But I respectfully dissent from the lead opinion's decision to reverse the Court of Appeals' decision to affirm the jury's determination of aggravating factors at the sentencing proceeding in *Applegate*.

---

[5] There will certainly be exceptions, where more is required to waive the right to an open courtroom, just as there are exceptions where more is required to waive the right to a jury. As the Court of Appeals explained in *State v. Downs*, 36 Wn. App. 143, 145, 672 P.2d 416 (1983) and *State v. Likakur*, 26 Wn. App. 297, 300-01, 613 P.2d 156 (1980), a written waiver will usually suffice. It may not suffice, however, when the record shows that the defendant needs more of an explanation: "*absent circumstances that initially raise a question regarding the defendant's capacity to waive a jury trial*, the trial court need not conduct an independent inquiry on that issue prior to accepting waiver." *Downs*, 36 Wn. App. at 145 (emphasis added) (citing *Likakur*, 26 Wn. App. at 300-01). That means that where there are special circumstances—such as those concerning competency or capacity—more than a silent written waiver is required.

Gordon McCloud, J.

McCalmon, J. P.T.

González, J.

No. 80727-2
(consolidated with No. 86513-2)

WIGGINS, J. (dissenting)—The lead opinion reverses the convictions in *Frawley* and *Applegate* for public trial violations even though Ronald Applegate affirmatively waived his right to a public trial and Brian Frawley never objected to the in-chambers questioning of one juror and, in fact, consented to it. I respectfully dissent.

I agree with Justice Gordon McCloud that a criminal defendant may affirmatively waive his or her right to a public trial as long as the waiver meets the constitutional standard for waiver. Concurrence/dissent at 2. Thus, like Justice Gordon McCloud, I would affirm the Court of Appeals and affirm Applegate's conviction because Applegate waived his public trial right.

I write separately because I also dissent from the lead opinion's decision in *Frawley*. Waiver is one way to lose on appeal; failure to object or show prejudice is another. Here, Frawley has not demonstrated that the limited questioning of jurors in chambers was structural error. In addition, he failed to object to the alleged closure at trial and fails to satisfy the requirements of RAP 2.5 on appeal. Neither defendant nor the lead opinion can identify any prejudice whatsoever resulting from the alleged error. Thus, I would hold that he is not entitled to a new trial.

Neither the lead opinion nor the defendants have identified any prejudice to either defendant as a result of the limited in-chambers voir dire. Instead, the lead

opinion resorts to the doctrine of structural error, concluding that the in-chambers voir dire rendered the trial fundamentally unfair. In relying on this highly theoretical prejudice, the lead opinion ignores the actual harm resulting from reversal and retrial. Not only is retrial a waste of judicial and prosecutorial resources, it subjects the rape victims in Applegate's case and the family of the murder victim in Frawley's case to the painful prospect of unnecessary retrials. The partially decomposed body of Frawley's victim was discovered with a ligature around her neck and bruising inflicted before her death. *State v. Frawley*, 140 Wn. App. 713, 716, 167 P.3d 593 (2007). Semen matching Frawley's DNA (deoxyribonucleic acid) and fibers from the car driven by Frawley were found on her body. *Id.* at 716-17. The jury found Frawley guilty, but the lead opinion reopens this 10-year-old murder case and subjects the victim's family to the ordeal of another trial. The *Applegate* jury found that Applegate repeatedly raped his wife's daughter and niece, from the ages 9 to 14 and 10 to 19 respectively, impregnating the niece at the age of 15. *State v. Applegate*, 163 Wn. App. 460, 464, 259 P.3d 311 (2011). The lead opinion overturns Applegate's conviction, reopening the trauma suffered by these young women two decades ago and subjecting them to a retrial. No legitimate purpose is served by subjecting these families to a retrial for in-chambers voir dire to which Applegate clearly consented and to which Frawley never objected.

ANALYSIS

I.  Our designation of all public trial violations as structural error is flawed

We should overrule our cases holding that all public trial violations, including failure to conduct a *Bone-Club*[1] analysis, are structural error. *State v. Wise*, 176 Wn.2d 1, 7, 288 P.3d 1113 (2012); *State v. Paumier*, 176 Wn.2d 29, 33, 288 P.3d 1126 (2012). This rule is incorrect and harmful. *City of Federal Way v. Koenig*, 167 Wn.2d 341, 346-47, 217 P.3d 1172 (2009) (stare decisis requires us to adhere to precedent unless our earlier decision is incorrect and harmful). Labeling all public trial errors as structural is incorrect because it conflicts with the clear definition of "structural error." This rule is harmful because it leads to unnecessary reversals where there is absolutely no showing of prejudice and it fails to reconcile competing constitutional interests.

A. *Conflicts with the definition of "structural error"*

In *Arizona v. Fulminante,* 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), the Supreme Court divided constitutional errors into two classes: structural errors and trial-type errors. *See State v. Levy*, 156 Wn.2d 709, 725, 132 P.3d 1076 (2006) (reiterating difference between structural and trial-type errors). As I explained in my dissent in *Paumier,*

> A structural error is an error that """necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.""" *State v. Momah,* 167 Wn.2d 140, 149, 217 P.3d 321 (2009) (alteration in original) (quoting *Washington v. Recuenco,* 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (quoting *Neder v. United States,* 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

35 (1999))), *cert. denied*, 131 S. Ct. 160 (2010). Structural errors "'infect the entire trial process'" and deprive the defendant of "'basic protections,'" without which "'no criminal punishment may be regarded as fundamentally fair.'" *Neder*, 527 U.S. at 8-9 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Rose v. Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)).

176 Wn.2d at 45-46. Structural errors defy harmless error review because they are "defects in the constitution of the trial mechanism." *Fulminante*, 499 U.S. at 309-10. These errors taint the entire proceeding but their specific prejudicial consequences are "necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana*, 508 U.S. 275, 282, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *see also Neder*, 527 U.S. at 7-9. By contrast, a trial-type error occurs "during the presentation of the case to the jury" and may be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08.

The rare cases in which the Supreme Court has deemed errors structural have involved complete denial of counsel (*Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)), denial of choice of counsel (*United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006)), denial of the public trial right due to closure of an entire suppression hearing (*Waller v. Georgia*, 467 U.S. 39, 49 n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)), a biased trial judge (*Tumey v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927)), racial discrimination in the selection of a grand jury (*Vasquez v. Hillery*, 474 U.S. 254, 263, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986)), and denial of the right to trial by jury where

4

the court gave a defective reasonable-doubt instruction (*Sullivan,* 508 U.S. 275). What these errors have in common is that they affect myriad aspects of trial, making it nearly impossible to assess how and whether the error affected the outcome of the case. *See Gonzalez-Lopez,* 548 U.S. at 150-51. Nevertheless, we presume they are prejudicial because they involve the complete denial of significant constitutional rights.

The lead opinion simplistically assumes that any time jurors are questioned in chambers the court has committed a structural error. But the United States Supreme Court has never held that selected in-chambers voir dire of certain jurors is automatically structural error and, indeed, has endorsed the practice in some situations. *See, e.g., Press-Enter. Co. v. Superior Court,* 464 U.S. 501, 512, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (when dealing with sensitive matters, limited questioning of jurors in chambers is appropriate). Cases where the Court has reversed a conviction due to an erroneous courtroom closure are limited. In *Presley v. Georgia,* 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010), the Court reversed a conviction because the courtroom was closed to the public for the entire voir dire. In *Waller,* the public was totally excluded from a seven-day suppression hearing that included testimony of witnesses. 467 U.S. at 42.

The lead opinion ignores statements by the Supreme Court that there are necessarily gradations of error and that labeling an error as structural in an extreme case does not automatically mean that any violation of that constitutional right is also structural error. The Court has noted that the central purpose of a criminal trial is to

5

determine guilt or innocence and that the court should focus "'on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" *Rose v. Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). The Court also noted, "'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'"" *Id.* (quoting *Van Arsdall*, 475 U.S. at 681 (quoting ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 50 (1970))). The Court concluded, "The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Id.* at 579. Accordingly, the Court concluded that a jury instruction that impermissibly shifted the burden of proof on a specific issue to the defendant was not necessarily structural error. *Id.* at 579-80.

The Court similarly held that even an instruction that might result in a defendant being found guilty for noncriminal conduct is not necessarily structural error. *United States v. Marcus*, 560 U.S. 258, 263-64, 130 S. Ct. 2159, 176 L. Ed. 2d 1012 (2010). "That is because errors similar to the one at issue in this case—*i. e.*, errors that create a risk that a defendant will be convicted based exclusively on noncriminal conduct—come in various shapes and sizes. The kind and degree of harm that such errors create can consequently vary." *Id.* at 265.

6

In *Marcus*, the Supreme Court rejected the defendant's argument that "we should apply the label '*Ex Post Facto* Clause violation' to the error in this case, and that we should then treat all errors so labeled as special, 'structural,' errors that warrant reversal without a showing of prejudice." *Id.* at 264. The Court held, "[H]owever Marcus' claim is labeled, we see no reason why this kind of error would automatically 'affec[t] substantial rights' without a showing of individual prejudice." *Id.* at 264-65 (second alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 173 L. Ed. 2d 266 (2009)).[2] Unfortunately, we have repeated the same mistake rejected by the *Marcus* Court: we have labeled any in-chambers voir dire as "structural error," oblivious to the actual impact or lack of impact on the defendant's right to a public trial.

Our own cases confirm that the nature and extent of an erroneous closure at trial can vary greatly. *See, e.g., State v. Shearer*, No. 86216-8 (Wash. Sept. 25, 2014) (in-chambers questioning of one juror who was ultimately dismissed); *cf. In re Pers. Restraint of Orange*, 152 Wn.2d 795, 801-02, 100 P.3d 291 (2004) (judge closed entire courtroom for two to four days of voir dire over the objection of the defendant's family); *State v. Easterling*, 157 Wn.2d 167, 172, 137 P.3d 825 (2006)

---

[2] The Supreme Court has reserved the "structural error" label for truly egregious errors. Indeed, there are cases where there was arguably more of a showing of prejudice than in any of our cases here, and yet the Court did not label the errors as structural. In *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009) the Court held that a trial judge's good faith error in denying defendant's peremptory challenge to a prospective juror, who subsequently served as the foreperson on the jury that found defendant guilty of first degree murder, was not a structural error that necessarily rendered defendant's criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence, as would warrant reversal.

(courtroom closed to defendant, defense counsel, and public during motion to sever a codefendant's trial). It follows that their effects on trial can vary as well, and I would hold that "the remedy should be appropriate to the violation." *Waller*, 467 U.S. at 50.

Indeed, the current cases provide examples of nonstructural public trial errors. In *Applegate*, before questioning a juror in chambers, the judge asked if any member of the public objected; no one objected. The court then asked if Applegate objected. After consulting privately with Applegate, defense counsel provided a valid waiver on behalf of his client. *See* concurrence/dissent at 8. The parties then briefly questioned one potential juror, who had asked to speak in private, in chambers.

In *Frawley*, because the case had garnered extensive pretrial publicity and involved sensitive issues regarding sexual assault, the judge used a preliminary questionnaire to ask prospective jurors four questions. If a juror answered yes to any of the questions, the judge interviewed that juror in-chambers regarding his or her answer. It is undisputed that Frawley waived his right to be present at this phase and eventually waived his right to public presence during general voir dire.

Neither of these errors was structural error. Structural error analysis asks us to determine whether the defendant received a fair trial, not a perfect trial. *See Lutwak v. United States,* 344 U.S. 604, 619, 73 S. Ct. 481, 97 L. Ed. 593 (1953) ("A defendant is entitled to a fair trial but not a perfect one."); *Paumier*, 176 Wn.2d at 44 (Wiggins, J., dissenting). In *Applegate*, the defendant knowingly and intelligently waived his right to a public trial. In *Frawley*, the trial judge should have obtained a waiver prior to the individual voir dire but there is absolutely no indication that failure

to do so rendered the trial unfair or unreliable. Thus, I would hold that the improper in-chambers voir dire did not constitute structural error because it did not render the trial unfair, nor did it convert an otherwise sound trial into an unreliable vehicle for determining guilt or innocence.

These errors fail to meet the high standard for structural error and do not belong in the same class of errors as closure of an entire suppression hearing, complete denial of counsel, a biased trial judge, or racial discrimination in the selection of a grand jury. Instead, these errors are analogous to the numerous other constitutional errors identified by the Supreme Court as subject to harmless error analysis. *See Fulminante*, 499 U.S. at 306-07 (listing errors subject to harmless error analysis, including jury instruction misstating an element of the offense, erroneous exclusion of a defendant's testimony regarding circumstances of his confession, restriction on a defendant's right to cross-examine a witness for bias, denial of a defendant's right to be present at all critical stages, and denial of counsel at a preliminary hearing).

Our current practice of deeming all public trial errors as structural is incorrect because it fails to consider that public trial violations take on many forms. Moreover, this rule conflicts with the definition of "structural error," which limits its application to extraordinary circumstances. Adhering to precedent, I would begin the structural error analysis with an inquiry into whether the improper closure rendered the trial fundamentally unfair. This requires analyzing what impact, if any, the closure had on the proceeding and, ultimately, the trial. Complete closure of an entire portion of trial

may be structural error because, in those instances, it is impossible to identify and evaluate the specific consequences flowing from the error, but prejudice is more likely. However, if a public trial violation is not structural error—i.e., if there is no indication that it rendered the trial fundamentally unfair or an unreliable vehicle for determining guilt—automatic reversal is not warranted. *See, e.g., State v. Rainey*, 180 Wn. App. 830, 845, 327 P.3d 56 (2014) (where public trial violation occurred at post trial suppression hearing, remand for new trial not appropriate; remanded for new hearing).

### B. *Leads to unnecessary retrials where there has been absolutely no showing of prejudice*

Our labeling of all public trial violations as structural is harmful because it has led to unnecessary reversals and retrials, even when there is absolutely no indication of prejudice.[3] Currently, we have in our court two cases in which it is clear that there has been no prejudice and yet a majority of this court would reverse the convictions. *See Shearer*, No. 86216-8, slip op. at 13 (lead opinion), slip op. at 3 (concurrence) (Wash. Sept. 25, 2014).

In *Shearer*, the judge questioned juror 7 in chambers after the she indicated that she would rather discuss sensitive domestic violence issues in private. *Shearer*, slip op. at 3 (consolidated with *State v. Grisby*). The judge asked if anyone objected

---

[3] That is because the remedy for structural error is automatic reversal and remand for a new trial; this remedy is truly automatic because, unlike most constitutional errors, structural errors are not subject to harmless error review. Lead opinion at 7; *see also Paumier*, 176 Wn.2d at 45-46 (Wiggins, J. dissenting).

to the in-chambers questioning, and neither defense nor the state objected. *Id.* In chambers, juror 7 revealed that her grandson was killed by his father in the home. *Id.* Defense moved to dismiss juror 7 for cause, the state did not object, and the juror was excused. *Id.* at 4. Similarly, in *Grisby*, the judge questioned one juror in-chambers after a question arose as to whether a prior criminal conviction would disqualify the juror. *Id.* The trial judge, counsel, and Grisby went into the chambers with the juror for five minutes. *Id.* There is no record of what happened. *Id.* Subsequently, defense counsel used a peremptory challenge to dismiss the juror. *Id.* at 4-5.

I fail to see how interviewing one juror in chambers had any adverse impact on these proceedings. The questioning occurred in the presence of counsel and the judge. The defendant, through his counsel, had the opportunity to question the juror and challenge him or her for cause or peremptorily. And in both cases, defense counsel used challenges to dismiss the jurors as a result of the in-chambers questioning.

As with the case before us, two recent Court of Appeals cases involve defendants who opted to have jurors questioned privately. In *State v. Herron*, 177 Wn. App. 96, 104, 318 P.3d 281 (2013), the defendant was informed of his right to have voir dire conducted in the courtroom but expressly requested that jurors be questioned in chambers, believing he would learn more by having the inquiries made in private. The court properly held that Jerry Herron had knowingly and voluntarily waived his right to a public trial. *Id.* In *In re Pers. Restraint of Copland*, 176 Wn.

11

App. 432, 442-43, 309 P.3d 626 (2013) defense counsel asked the trial judge to close the courtroom to members of the media during the jury selection process to prevent contamination of potential jurors. The court held that Copland's case presented "an even stronger argument for invited error" than the facts in *State v. Momah*, 167 Wn.2d 140, 154-55, 217 P.3d 321 (2009) because the defendant actively pursued and participated in the error of which he complains. *Copland*, 176 Wn. App. at 442. Accordingly, the court dismissed the personal restraint petition. *Id.* at 452.

These Court of Appeals decisions uphold the spirit and purpose of the public trial right—to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury. *State v. Brightman,* 155 Wn.2d 506, 514, 122 P.3d 150 (2005). None of these goals is necessarily jeopardized when counsel questions potential jurors in chambers in an attempt to encourage them to be more forthcoming about sensitive topics. This is particularly true where, as here, the defendant approved of the tactic and wanted to benefit from increased candor—Frawley waived his right to be present during the questioning because he thought jurors would be more forthcoming in his absence. The defendant certainly *may* be prejudiced by in-chambers voir dire, but such prejudice is not "conclusive," nor should it be presumed. Indeed, this rule creates a disturbing win-win for the defendant. As I explained in my dissent in *Paumier,*

> The majority would allow defense counsel to lie in the weeds, silently consenting to private questioning (and reaping the benefits of increased candor), while secretly nursing a public trial issue that would virtually

12

guarantee success on appeal. This would allow any defense counsel who notices a public trial error like this one to remain quiet and gamble on a jury verdict, knowing that the public trial issue will allow a do-over once it is raised on appeal.

176 Wn.2d at 52 (footnote omitted).[4]

Blanket application of the structural error doctrine to public trial violations has led to the vacation of dozens of convictions, even where there has been absolutely no indication of prejudice. *See State v. Smith,* No. 85809-8, slip op. at 8 n.4 (concurrence). It is grossly inefficient to overturn these convictions. The *Frawley* case took almost a year to try from pretrial motions to verdict; involved 33 witnesses, 65 exhibits, and an initial pool of 60 jurors; and resulted in a first degree felony murder conviction. We disserve our justice system, principles of finality and fairness, the public, all participants to a trial, and especially the victims of crime by failing to engage in a meaningful inquiry to determine whether or not the defendant received a fair trial—that is, a trial that does credit to our justice system and to the concept of due process.

Labeling every public trial error as structural is a meat-cleaver approach to what necessarily must be a highly nuanced, case-by-case inquiry into whether a particular error requires reversal. In reality, there are many factors that bear on the multiple concerns implicated whenever there is public trial violation: importance of

---

[4] In *Wise* and *Paumier*, the dissents pointed out that the defendants actually benefited from the closures because prospective jurors may have been more candid about hardships and biases in private questioning. *Wise*, 176 Wn.2d at 25 (J.M. Johnson, J., dissenting); *Paumier*, 176 Wn.2d at 52 (Wiggins, J., dissenting).

the right to the defendant when balanced against other competing rights, importance of the right to the public, and basic principles of fairness. We should consider all of these factors to determine whether the defendant has been prejudiced by the violation of a constitutional right before reversing a conviction for error.

### C. Fails to reconcile competing constitutional interests

The lead opinion's approach ignores competing constitutional rights. In fact, the right to a public trial is just one of many rights guaranteed by our constitution to persons accused of crimes. Among other rights are the right to trial by an impartial jury, the right to a speedy trial, and the right to a fair trial.[5] *See* CONST. article I, § 22.

Generally, the constitutional guaranties of a public and fair trial advance the common goal of an effective and fair judiciary. However, these essential rights at times conflict. For example, allowing public access to all phases of trial potentially interferes with a defendant's right to a fair and impartial jury due to adverse publicity, juror contamination, and juror privacy and safety concerns. *See, e.g., State v. Slert*, No. 87844-7, slip op. at 10 (Wash. Sept. 25, 2014) ("[q]uestioning the jurors about their disqualifying knowledge in open court in front of the other jurors could have been potentially devastating to Slert's right to a fair trial" due to contamination); *Shearer*, slip op. at 3 (juror reluctant to answer questions regarding experience with domestic violence in open court).

---

[5] While all of these rights are in a broad sense for the protection of the public generally, they are in a special sense privileges accorded to the accused. This is one of the reasons I agree with Justice Gordon McCloud in her concurrence/dissent that a defendant may knowingly and intelligently waive his or her right to a public trial.

14

Indeed, in-chambers voir dire can protect the defendant's right to a fair and unbiased trial by encouraging potential jurors to be more forthcoming in responding to voir dire. Empirical studies have shown that prospective jurors often do not reveal sensitive information if required to do so in open court. *See* Paula L. Hannaford, *Safeguarding Juror Privacy: A New Framework for Court Policies and Procedures,* 85 JUDICATURE 18, 23 (2001). Moreover, publicizing juror responses to voir dire questions could expose them to scorn or ridicule. *See Press-Enter.,* 464 U.S. 501. The knowledge that their responses will be made public may inhibit or destroy the integrity of jurors' responses to questions. *See United States v. Layton,* 519 F. Supp. 959, 961-62 (N.D. Cal. 1981). Consequently, the voir dire may not successfully elicit the information necessary to effectively screen jurors, which, in turn, may adversely affect the fairness of a trial.

When the right to a fair trial and the right to a public trial conflict, neither right is more deserving of constitutional protection. Trial courts are faced daily with the difficult task of preserving a criminal defendant's right to a fair trial while safeguarding the constitutional mandate that our courts be open. Unfortunately, our open courts jurisprudence seems to have developed in a vacuum, ignoring the reality that many decisions require courts to balance important, competing constitutional interests.

Public access can also have adverse impacts on jurors' constitutional right to privacy. *See Press-Enter.,* 464 U.S. at 511-12 (acknowledging that juror privacy right

15

might become sufficiently compelling to require limiting public access).[6] Under article I, § 7 of the state constitution, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This right of privacy extends to jury service; the public's right of access to court records "is not absolute" but instead "shall be consistent with reasonable expectations of personal privacy as provided by article I, section 7 of the Washington State Constitution." GR 31(a). To this end, GR 31(j) provides, "Individual juror information, other than name, is presumed to be private" and juror information can be obtained only "[u]pon a showing of good cause." We should not ignore the many constitutional interests at stake in order to protect the one.

II. When error is not structural and the defendant does not object, RAP 2.5 is a procedural bar to appeal

In accordance with controlling precedent, I would hold that structural error analysis is appropriate only when applied to extraordinary circumstances that render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. When a public trial violation is not structural error and a defendant does

---

[6] In *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009), we reversed a child rape and molestation conviction because jurors were questioned in chambers regarding their experience with sexual abuse. Justice Charles Johnson dissented, finding that the plurality "dismisse[d] out of hand the legitimate privacy interests of jurors." *Id.* at 237. Justice Johnson explained that juror privacy and candidness could be particularly important in cases that involve extremely sensitive matters and that these interests could interfere with a defendant's right to an impartial jury. *Id.* Justice Johnson concluded that the trial judge balanced the jurors' interest in privacy with the defendant's right to a public trial by an impartial jury and properly questioned jurors in-chambers. *Id.*

not object, RAP 2.5 controls and the defendant must show prejudice. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013).

Applying these principles to this case, I would hold that Frawley is not entitled to a new trial. The public trial error here was not structural, and Frawley did not object. Thus, RAP 2.5 applies. Under RAP 2.5, an appellate court need not review errors raised for the first time on appeal, but there is an exception for any "manifest error affecting a constitutional right." RAP 2.5(a)(3). If an error is constitutional in nature, it can be reviewed for the first time on appeal only if it is "manifest," meaning it "'had practical and identifiable consequences in the trial of the case'" and can survive harmless error review. *State v. O'Hara*, 167 Wn.2d 91, 98-100, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 925, 155 P.3d 125 (2007)). In other words, a defendant who does not object must show actual prejudice resulting from the error. *Id.*

There is no indication of prejudice in *Frawley*. Closure occurred because the defense wanted the private questioning, and it was conducted for the defendant's benefit.[7] Defense counsel asked the court to waive his client's presence for jury selection. The court noted that in its experience, jurors talk more freely about sensitive issues in private. In light of this, Frawley waived his own right to be present;

---

[7] The record does not reflect whether or not the courtroom was ever actually closed to the public. In his opening remarks to counsel before testimony began, the judge expressly addressed the courtroom audience, saying that "the court is always open to the public as it should be. I believe our court should always be open to the public, and that's why I allow the press to come into the courtroom and that's important." 6 Verbatim Report of Proceedings at 1068.

arguably, the public's presence would have similarly discouraged jurors from being forthright with their answers. Moreover, only jurors who answered yes to any question in the questionnaire, which was designed to identify bias or contamination, were called into chambers. Thus, the closure furthered Frawley's right to a fair trial and I would find that, under the circumstances, this right outweighed the defendant's right to a public trial.

## CONCLUSION

The lead opinion holds that all public trial errors are structural, tainting the entire proceeding, rendering the trial fundamentally unfair, and requiring automatic reversal. The lead opinion fails to appreciate the limited nature of structural error analysis and fails to consider that public trial violations take on many forms. Questioning jurors in chambers on sensitive topics with the defendant's agreement is not fundamentally unfair in the same way as, for example, complete denial of counsel or a biased trial judge. We should not presume prejudice where, had the trial judge performed a *Bone-Club* analysis, there is every reason to believe that closure would have occurred in exactly the same manner.

Here, because the error was not structural, we should instead apply the well-developed and more precise rules we have incorporated into RAP 2.5. RAP 2.5 requires that Frawley's and Applegate's convictions be affirmed.

I respectfully dissent.

_Wiggins, J._

_Madsen, C.J._