# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-0249
Filed January 7, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**John Walter Spooner,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable David P. Odekirk, Judge.

———————————

**AFFIRMED**

———————————

Martha J. Lucey, State Appellate Defender, Kyle R. Kopf (argued), Student Legal Intern, and Theresa R. Wilson, Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Joshua Henry (argued), Assistant Attorney General, attorneys for appellee.

———————————

Heard at oral argument
by Chicchelly, P.J., and Buller and Langholz, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

John Spooner appeals following his conviction for arson in the first degree, arguing the district court abused its discretion when it denied his motion for new trial. He also asks us to take judicial notice of other district-court proceedings, while the State moves to strike his reply brief for citing outside-the-record materials. For the reasons that follow, we affirm the conviction, deny the motion for judicial notice, and strike the offending portions of the reply brief.

## BACKGROUND FACTS AND PROCEEDINGS

Spooner had been staying for a few days at a Waterloo home owned by Tony Grider, where Grider lived with roommates Daniel Luck and Ellen Hammett. The night before the fire, Spooner made some unusual statements to Luck, including asking him: "Do you feel safe in this house?" Luck thought the question was "kind of, like, off-the-chain"—he didn't understand what prompted it. So he brushed it off and told Spooner he didn't want to hear anything more like that. Hammett had a similarly strange encounter with Spooner that night when she saw him pacing and talking to himself. She was unnerved enough she texted Grider that she thought Spooner was "tripping."

Early the next morning, Tracy Glawe—a neighbor who briefly met Spooner at the Grider house—encountered Spooner in a nearby church parking lot; he had a large blue lighter in his hand. Glawe thought Spooner was acting "different, just not normal" and recorded her interactions with him on her cell phone for several minutes. On the recordings, Spooner says "blow it up" or "blow 'em up" multiple times, something about "gas" and "smoke," "get out while you can," and "I did what I had to do." He is also seen repeatedly "flicking" the lighter. Glawe thought Spooner was either on

drugs or not "in his right mind." Some fifteen to twenty minutes after her first encounter with Spooner, Glawe saw the Grider home "engulfed" in flames.

Back at the house, Luck woke up to a loud bang. Next, he heard someone—probably Hammett—screaming "the house is on fire." Hammett heard what she described as "a lot of glass breaking" before she saw flames outside Grider's room, jumped out the window, and screamed.

When Luck got up to look, he saw "nothing but flames outside [his] window." He felt his bedroom door, and it was hot. When he opened his door and looked down the hall at Grider's room, "it was all smoke coming out and flames around the top of the door." Luck couldn't escape through the interior of the house because of the fire, so he eventually pushed out his window-unit air conditioner and planned to jump from the second story. He didn't know whether Grider was home or not, but the fire was raging through the lower level. In his words: "You couldn't get out. There's no way a person could walk through that and survive."

Three different men commuting to work spotted the house fire and stopped to render aid. As they approached, Hammett was still screaming about the fire and that there was someone inside. The men helped Luck successfully jump from his window into a makeshift pile of tires and garbage containers. And they overheard chatter about "Tony" still being inside, but the fire was too hot and the flames too big for anyone to attempt a rescue.

Two of the commuters spotted a gas can in the road about a house-distance away from the fire, and one of these commuters had a dash-cam that captured the gas can and scene on video. These commuters, as well as the dash cam, also spotted Spooner nearby. One of the commuters spoke to

Spooner, who seemed "calm" and "composed." Spooner, unprompted, said "Tony either can't get out" or "doesn't want to." When Hammett asked Spooner why he didn't alert her or the others to the fire, Spooner responded by asking her if she saw a serpent.

Waterloo Fire and Rescue responded to the blaze, which was only a block from the fire station. Firefighters observed that "the whole front of the house was on fire," the porch was "fully engulfed," and it was spreading. The fire was heaviest on the porch. Firefighters pumped water to tame the flames before making their way inside to search for Grider, who they found unresponsive on his bedroom floor. One firefighter also spotted the gas can in the street that the commuters had seen, moved it to the side of the road to protect it, and located a matching nozzle nearby. Police seized the gas can and nozzle. And investigators submitted samples from the gas can, Grider's body, and flooring from the scorched porch to the State Crime Lab for analysis by the Division of Criminal Investigation (DCI).

A fire investigator and the local fire marshal both concluded that the fire most likely started on the porch near the front door based on the fire damage, burn patterns, and movement of fire through the house. They concluded there was no evidence the fire originated from an electrical source like an appliance or outlet, a natural cause like a lightning strike, or any accidental cause like a cigarette. Analysis by the DCI established that gasoline was found in the gas can and on a piece of wood decking from the porch consistent with where the fire investigator and fire marshal opined the fire began. Another piece of flooring had an aromatic ignitable fluid—like a lacquer thinner—on it, but its relevance to the fire was not clear. Additional gas cans were identified near the front and back entrances to the house. No gasoline was found on Grider's person or effects.

Officers took Spooner to the police department for questioning. He was at times "kind of hard to understand," but he also provided officers with fairly detailed background information about himself. Spooner told officers he was staying at the residence but said he thought Grider set the fire. He explained further that he saw the fire had started on the porch and that he tried to put it out. And he said he found a gas can near the fire but moved it. Spooner never admitted to starting the fire and told the officers at one point—essentially unprompted—that "this is not arson." When they searched his person, officers found Spooner had a large blue lighter.

While at the jail, one of the officers thought Spooner seemed "a little delusional." And he seemed at one point to be talking to himself or yelling at people who weren't there. He denied consuming any drugs or alcohol in the last two days.

Independent of the policework at the scene, Waterloo police investigators also worked on obtaining video surveillance from a nearby church. They were able to acquire digital footage that showed Spooner on the house's porch for about two minutes before there was smoke, followed shortly by the gas can rolling into the street, and the house visibly on fire within three minutes. There was no smoke or fire visible until after Spooner was on the porch.

The county attorney charged Spooner with arson in the first degree, a class "B" forcible felony in violation of Iowa Code section 712.2 (2022). Spooner demanded speedy trial. When the court asked on the first day of trial whether Spooner understood he could waive speedy trial, he told the court he understood and preferred to maintain his demand: "I just want to get it [the case] cleared up and took care of as quickly as possible." The jury found him guilty as charged.

After a lengthy series of continuances, Spooner eventually moved for a new trial on the basis of what he claimed was newly discovered evidence in the form of expert witness reports he commissioned and received after the verdict. The State resisted, urging the defense could have timely obtained this evidence with due diligence and that it would not have likely changed the outcome at trial. After an evidentiary hearing, the district court denied the motion for new trial by written ruling and sentenced Spooner to prison. He appeals.

## REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE REPLY BRIEF

Before reaching the merits, we address a procedural issue submitted to us by supreme court order. In his reply brief, Spooner encouraged our appellate courts to take judicial notice of filings from a later district court case in which he was charged with homicide for Grider's death. From these documents, Spooner makes arguments about how certain expert testimony might have changed the outcome in the case giving rise to this appeal. The State resists judicial notice and moves to strike Spooner's reply brief on three bases: first, that the documents Spooner points to are outside the record on appeal; second, that the information was not before the district court when it decided the issue; and third, that Spooner is attempting to impermissibly raise a new issue in his reply brief.

Iowa Rule of Appellate Procedure 6.801 defines the record on appeal to include:

> a. Original documents and exhibits filed in the district court case from which the appeal is taken.

> b. Transcript of proceedings, if any.

6

c. Court calendar entries prepared by the clerk of the district court.

d. Documents from related cases when judicial notice was taken of the specific document or file.

e. Documents or filings from other cases when required by law, including Iowa Code section 822.6A involving claims of postconviction relief.

Plainly the documents at issue were not from "the . . . case from which the appeal is taken," and Spooner argues instead we should take judicial notice for the first time on appeal.[1] *See id.* But "it is not proper for the court to consider or take judicial notice of the records of the same court in a different proceeding without an agreement of the parties." *State v. Washington*, 832 N.W.2d 650, 655–56 (Iowa 2013) (citation omitted); *accord State v. Gale*, 21 N.W.3d 151, 156 (Iowa 2025) (describing the "general rule" that "courts do not take judicial notice of records in a different proceeding when a party objects"). And here, the State objects to this outside-the-record material.

As a preliminary matter, we generally disfavor any attempt to raise new issues or inject new record into an appeal by means of reply brief. *See Villa Magana v. State*, 908 N.W.2d 255, 260 (Iowa 2018). For our purposes here, we assume without deciding that Spooner's reply brief is in fact responsive rather than a new argument. And we conclude the information at issue is outside the record on appeal: it is from a different district court case number,

---

[1] In his resistance, Spooner briefly claims that April 2024 amendments to the rules of appellate procedure may suggest some broadening of the power to take judicial notice for the first time on appeal. We disagree. As Spooner admits, the rule refers to "when judicial notice *was* taken"—past tense which refers to the proceedings below. Iowa R. App. P. 6.801(d) (emphasis added). We similarly reject Spooner's suggestion that we consider the records because they were transmitted to the clerk of appellate courts in another appeal: appellate courts are not like free-range chickens, hunting and pecking through different case files in the clerk's office.

and it was not before the district court at the time it made its decision. *See* Iowa R. App. P. 6.801; *Alvarez v. IBP, Inc.*, 696 N.W.2d 1, 3 (Iowa 2005). Given the State's objection, we follow the general rule and decline to take judicial notice for the first time on appeal. *Washington*, 832 N.W.2d at 655–56; *Gale*, 21 N.W.3d at 156. And even if we had discretion to take judicial notice for the first time at this stage of the proceedings, we would exercise our discretion to decline judicial notice given the underlying policy rationales of decisions like *Washington* and *Alvarez* and rule 6.801. As a result, we grant the State's motion to strike the offending portions of Spooner's reply brief. We do not consider any material from Spooner's homicide case, though we note in the interests of completeness that its direct appeal is also decided today: *State v. Spooner*, No. 24-1180, 2026 WL ___ (Iowa Ct. App. Jan. 7, 2026).

## ERROR PRESERVATION AND UNPRESERVED ERRORS

The State also challenges whether Spooner adequately preserved error on all of the claims he advances on appeal. Spooner argued below that he was owed a new trial on the basis of newly discovered evidence, and we find that error was preserved. But Spooner makes some additional challenges on appeal, including that he was denied a fair trial because he had to make a choice between demanding speedy trial and giving his experts more time to investigate the case and form their opinions. That argument was not made below and is not preserved for our review.

Anticipating this problem, Spooner argues that our appellate courts have a freewheeling power to reverse based on unpreserved errors when we find the underlying trial was not fair. As authority for this claim, he cites a fifty-year-old supreme court case—*State v. Post*, 123 N.W.2d 11, 15

(Iowa 1963). We don't think this reading of *Post* survives in the modern era for at least three compelling reasons.

First, a legion of supreme court cases since then have firmly restated our error-preservation rules. *See, e.g.*, *State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021) ("We have repeatedly rejected plain error review and will not adopt it now."); *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."); *State v. Rutledge*, 600 N.W.2d 324, 326 (Iowa 1999) ("[S]imple justice demands rigid adherence to the [error-preservation] rule."). We could not depart from these holdings even if we wanted to.

Second, *Post* and related cases relied on Iowa Code section 793.18 (1962), which then provided:

> If the appeal is taken by the defendant, the supreme court must examine the record, without regard to technical errors or defects which do not affect the substantial rights of the parties, and render such judgment on the record as the law demands; it may affirm, reverse, or modify the judgment, or render such judgment as the district court should have done, or order a new trial, or reduce the punishment, but cannot increase it.

But the General Assembly "narrow[ed]" that statute in the following decade's criminal code revision, adopting essentially the modern provision — which grants the appellate courts "authority to disregard technical errors in taking the appeal if corrected, but not to disregard *any* technical error." *State v. Crawford*, 972 N.W.2d 189, 205 (Iowa 2022) (Waterman, J., concurring in part and dissenting in part); *see also* 1976 Iowa Acts ch. 1245, § 1420 (codified at Iowa Code § 814.20 (1978)). In other words, to the extent a statute previously granted appellate courts the freewheeling power to correct unpreserved injustices, the General Assembly stripped that power nearly

fifty years ago. And we observe that claiming such a power for ourselves would be wholly in conflict with our statutory mandate: "We are a 'court for the correction of errors at law,' and we cannot correct an 'error' the district court never made." *State v. Hernandez*, 20 N.W.3d 502, 509 (Iowa Ct. App. 2025) (en banc) (quoting Iowa Code § 602.5103(1) (2022)).

Third, we tend to agree with the State's observation that authority to grant a new trial based on our sense of substantial justice is a creature of civil—rather than criminal—procedure. *See State v. Berge*, No. 17-1097, 2018 WL 5291327, at *4 (Iowa Ct. App. Oct. 24, 2018) (noting "four areas where the concept of substantial justice arises": personal jurisdiction in civil cases, a new trial under the rules of civil procedure, continuances under the rules of civil procedure, and a civil mandamus action). As the supreme court recently reiterated, we do not import concepts from civil law into criminal law absent express direction. *See Christensen v. Iowa Dist. Ct.*, 21 N.W.3d 529, 533 (Iowa 2025) ("The rules governing civil procedure were never intended or designed to apply in criminal cases.").

As a final observation on this point, we note that—even if something like the *Post* power persisted today—we would not exercise it here. For largely the same reasons we discuss below, we would not grant Spooner appellate relief on this unpreserved error. He had a fair trial, and his buyer's remorse over demanding speedy trial is no basis for relief.

## STANDARD OF REVIEW

We review denial of a motion for new trial claiming newly discovered evidence for an abuse of discretion. *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020). The court below has "unusually broad discretion" to decide these claims. *Id.* (cleaned up). And the supreme court has mandated the

district court "closely scrutinize [these motions] and grant them sparingly." *Id.* (cleaned up).

## DISCUSSION

The factual basis for Spooner's new-trial claim was developed at an evidentiary hearing in January 2024—more than a year after his November 2022 trial. Spooner presented evidence from John Lentini and Douglas Carpenter, two hired experts in different aspects of fire investigation. According to Spooner's trial attorney, she first solicited contact information for expert witnesses on December 12, 2022—a month after trial.

Lentini, who focused more on fire chemistry, testified that he was first contacted in May of 2023 and authored a report that same month. He opined that the gasoline found on the deck did not come from the gas can found in the road near the house. And he admitted that this opinion was based on a calculation "outside the scope of the standard" governing the laboratory equipment at issue.

Carpenter, who focuses more on engineering, was first contacted in January 2023, visited the site of the house in late 2023, and reviewed video and other evidence. He opined that the fire started in the living room (not on the porch), but he was unable to identify a cause or what started the fire. In other words, he would have ruled the cause of fire "undetermined." This opinion was based in part on certain findings from Grider's blood, though Carpenter admitted on cross-examination Grider's blood levels were within the normal documented range of persons who die in a fire.

The DCI criminalist also testified at the new-trial hearing, explaining that scientific testing could neither prove nor exclude that the gasoline from the gas can matched the gasoline found on the porch. And the fire marshal

explained that he had considered but ruled out the alternative fire causes or points of ignition put forward by Carpenter.

The district court denied the motion for new trial by written ruling after the hearing. It correctly recited the law, recognizing the rules of criminal procedure permit granting a new trial "when the defendant has discovered important and material evidence in the defendant's favor since the verdict that the defendant could not with reasonable diligence have discovered and produced at the trial." Iowa R. Crim. P. 2.24(2)(c). And the court correctly recognized the four elements the supreme court has distilled the rule into, requiring a criminal defendant to prove the evidence "(1) was discovered *after* the verdict, (2) could not have been discovered earlier in the exercise of due diligence, (3) is material to the issues in the case and not merely cumulative, and (4) probably would have changed the result of the trial." *Uranga*, 950 N.W.2d at 243 (citation omitted).

The district court focused its denial of Spooner's motion on the second and fourth prong—due diligence and the probability of changed outcome. And the court made five specific findings:

- "[T]he evidence set forth in the defendant's post-trial filings and testimony offered through his witnesses [at the new-trial hearing] could have been discovered with reasonable diligence and produced at trial."

- "The defendant stood on his demand for a speedy trial and made a strategic decision not to continue trial to pursue other investigation or defenses which he now wishes to present."

- "The defendant's request for a new trial is the kind of unfair gamesmanship frowned upon by the supreme court in *Uranga*."

12

- "[T]he Court does not find the testimony of the defendant's experts would have changed the outcome at trial."; and

- "The Court finds the overwhelming credible evidence at trial supports a finding that the defendant started the fire."

We consider Spooner's appellate contentions with these findings in mind. And like the district court, we focus on due diligence and the probability of a changed outcome.

## I.    Due Diligence

The supreme court recently summarized the principles and precedent surrounding the due-diligence prong:

> The showing of diligence required is that a reasonable effort was made. The defendant is not called upon to prove he sought evidence where he had no reason to apprehend any existed. However, a defendant must exhaust the probable sources of information concerning his case; he must use that of which he knows, and he must follow all clues which would fairly advise a diligent man that something bearing on his litigation might be discovered or developed. Many, perhaps most, newly discovered evidence claims must be rejected on the basis of the second standard (could not have been discovered earlier in the exercise of due diligence)
>
> As a general rule, a defendant is not entitled to a new trial on the basis of newly discovered evidence where the defendant was aware of the evidence prior to the verdict but made no affirmative attempt to obtain the evidence or offer the evidence into the record. Thus, in *State v. Jefferson*, [545 N.W.2d 248, 251 (Iowa 1996),] we affirmed the district court's denial of the defendant's motion for new trial where the defendant learned of the evidence during trial but took no affirmative action to get the evidence in the record prior to the jury returning its verdict. We explained the defendant must seek out evidence of which he was aware to prevent the defendant from gambling on a defense verdict while holding back his grounds for a new trial in case the jury returned a verdict of guilty.

Similarly, in *State v. Compiano*, [154 N.W.2d 845, 851 (Iowa 1967)] we affirmed the district court's denial of the defendant's motion for new trial where the defendant learned of potential new evidence during trial but did not seek a continuance to investigate the matter. We affirmed the trial court's finding that due diligence had not been shown. We explained the rationale of the rule was to bring finality to the criminal trial and to avoid unfair gamesmanship, stating, Courts are aware that, unless a movant is required to show timely due diligence in the discovery of new evidence, his newly discovered evidence might be withheld as trial strategy to obtain a second trial if needed.

*Uranga*, 950 N.W.2d at 243–44 (cleaned up) (emphasis omitted). Applying these principles, the supreme court denied Uranga relief because he "was aware" of the newly discovered evidence before the verdict was rendered, even though he never sought to obtain it. *See id.* at 244. And the court emphasized that, when a defendant learns of potential new evidence during trial, he should seek a continuance to investigate—not rely on a new-trial motion for relief. *Id.*

With this backdrop, we discern no abuse of discretion by the district court analyzing due diligence here. First, we defer to and credit the inherent credibility determinations made by the district court in its finding that Spooner made a strategic choice to not seek a continuance and that the evidence at issue could have been discovered before or during trial in the exercise of due diligence. Consistent with *Compiano*, we decline to reward Spooner's unfair gamesmanship by granting relief when Spooner gambled on the verdict rather than waive speedy trial and conduct a more thorough investigation with expert witnesses. *See* 154 N.W.2d at 850–51. And, like in *Uranga*, we agree with the district court that Spooner "was aware" of or on notice of the need to seek out this evidence well before the verdict was returned, even though he declined to do so. *See* 950 N.W.2d at 243–44. We

14

thus agree with the district court's conclusion that the evidence could have been timely discovered with due diligence.

In addition, we acknowledge the State in its brief supplies a laundry list of state appellate courts that have concluded expert testimony is not newly discovered if the *facts* underlying the testimony were known at trial. *See, e.g.*, *Foley v. Commonwealth*, 425 S.W.3d 880, 887 (Ky. 2014); *Woodward v. State*, 276 So. 3d 713, 759–61 (Ala. Crim. App. 2018) (collecting cases); *In re Copland*, 309 P.3d 626, 636 (Wash. Ct. App. 2013). We generally agree with these courts. And we particularly agree with an observation made by the Minnesota Supreme Court that, if every new expert opinion qualified as newly discovered evidence, "no verdict would ever be final." *State v. Blasus*, 445 N.W.2d 535, 543 (Minn. 1989). But, given our application of *Uranga* and *Compiano*, we need not rest our holding exclusively on these out-of-state authorities to affirm denial of the new-trial motion on the due-diligence prong.

## II. Probability of Changed Outcome

Even if we did not find the due-diligence prong warranted affirming, we also agree with the district court's finding that Spooner did not prove the expert testimony was likely to change the outcome at trial, which independently supports denying the new-trial motion. The district court "is generally in a better position than we to determine whether evidence, newly discovered, would probably lead to a different verdict upon retrial." *Compiano*, 154 N.W.2d at 849. And here, the court made specific findings regarding the probability of a different outcome and concluded that "the overwhelming credible evidence" supported a finding of guilt.

Even if we were not bound to give deference to it, we agree with this conclusion based on our review of the record evidence. "The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation." *More v. State*, 880 N.W.2d 487, 499 (Iowa 2016). In our view, the gist of the new-trial evidence was to impeach the arson investigation conducted by the fire marshal, as supported by the crime lab's testing. But, in reading the transcript of the new-trial evidentiary hearing, we think the experts were at best a wash when the State experts responded. And even if Spooner was able to materially impeach the arson investigation's conclusion about where in the house the fire started, this does nothing to undermine the eyewitness testimony, the video of Spooner holding the lighter, or the surveillance footage of him walking up to the house and the house catching fire minutes later. And beyond that, Spooner's own admissions were damning albeit bizarre: his repeated references to "blow it up" and "smoke," that he saw the fire start on the porch, and the video of him handling the gas can are all incriminating if not compelling.

In short, we agree with the district court's ruling. And we are mindful that, even if we did not agree, we would be required to give great deference to the district court given its advantaged position to decide new-trial issues. Spooner has not demonstrated an abuse of discretion.

## DISPOSITION

We affirm Spooner's conviction for arson in the first degree, we deny his request for judicial notice, and we grant the State's motion to strike the portions of Spooner's reply brief that rely on outside-the-record information.

**AFFIRMED.**